W.R. GRACE & CO.-CONN. *vs.* COMMISSIONER OF REVENUE.

No. 00-P-254.

Suffolk. April 17, 2002. - July 2, 2003.

Present: ARMSTRONG, C.J., LAURENCE, & CYPHER, JJ.

*Taxation,* Corporate excise, Abatement. *Corporation,* Subsidiary. *Constitutional Law,* Taxation. *Due Process of Law,* Taxation.

Discussion of the due process requirements for State taxation of income generated by a corporation's interstate activities, and the standard of review applied to such cases. [473-474]

The Appellate Tax Board (board) correctly found that an out-of-State corporation and certain of its subsidiaries shared little to no functional integration, centralization of management, or economies of scale such as would, under due process principles, create an enterprise that was "unitary" with business carried on in the Commonwealth and justify the taxation of capital gains realized by the corporation from the sale of those subsidiaries; however, with regard to other subsidiaries of the corporation, the board's findings were insufficient to justify a similar conclusion, and the case was remanded for further findings to determine whether those other subsidiaries constituted a unitary enterprise with the corporation, thus subjecting the income derived from their sales to taxation. [474-478]

APPEAL from a decision of the Appellate Tax Board.

*Edward J. DeAngelo,* Assistant Attorney General, for Commissioner of Revenue.

*Paul H. Frankel* (*Maxwell D. Solet* with him) for the taxpayer.

ARMSTRONG, C.J. This appeal by the Commissioner of Revenue (commissioner) raises the question whether Massachusetts may tax a portion of the capital gains W.R. Grace & Co.-Conn. (Grace) realized on the sale of several of its retail and restaurant subsidiaries. During the period at issue, Grace was a Connecticut corporation that conducted business in all fifty States. It was assessed a corporate excise tax of $1,270,186 for the tax year ending December 31, 1986, on capital gains derived from the sales of (1) a 56% stock interest in Herman's Sporting Goods, Inc. (Herman's); (2) an 82.24% stock interest in Grace Retail

Corporation, which was comprised of the Channel and Central Home Improvement Center Divisions (Channel/Central); and (3) several restaurant chains (the restaurant group), including El Torito Restaurants, Inc. (El Torito).

Grace paid the assessed taxes and filed an application for abatement, which was denied in June, 1996. That December, Grace filed a petition with the Appellate Tax Board (board). After conducting a hearing in May, 1998, the board decided in favor of Grace and granted the abatement in August, 1999. It issued findings of fact and a report in November, 1999.

Every foreign corporation doing business in Massachusetts must pay an excise based in part on its net income. G. L. c. 63, § 39. The taxable net income is the amount "derived from business carried on within the commonwealth," which is ascertained by a three-part apportionment formula based on the ratio of the corporation's property, payroll, and sales in Massachusetts to its property, payroll, and sales everywhere. G. L. c. 63, § 38, first par., & § 38(*c*)-(*f*).

The board concluded that the transactions that generated Grace's capital gains lacked the minimal connection to Massachusetts required by the United States Constitution to justify imposing the excise tax. That connection is supplied "when the activity sought to be taxed is a component of an enterprise which is deemed 'unitary' with the business carried on in the taxing State." *W.R. Grace & Co.* v. *Commissioner of Rev.*, 378 Mass. 577, 585 (1979) (*Grace I*). See *Allied-Signal, Inc.* v. *Director, Div. of Taxn.*, 504 U.S. 768, 778-783 (1992). The board determined that Grace and the subsidiaries it sold did not constitute a unitary enterprise, and that Grace had proven by "clear and cogent evidence" that imposition of the excise would result in taxation of extraterritorial values. The commissioner has appealed.

We affirm that portion of the board's decision that holds that Massachusetts may not tax the income derived from Grace's sale of Herman's and El Torito. We vacate the remainder of the board's decision and remand the case for further findings and a determination whether Grace constituted a unitary enterprise with Channel/Central and the businesses in the restaurant group

other than El Torito, thus subjecting the income derived from their sales to taxation. If the board determines that the income from the latter sales may be taxed, it must decide whether the net income should be calculated according to the apportionment formula set out in G. L. c. 63, § 38, or whether, as Grace argues, it should be calculated according to an alternative method pursuant to G. L. c. 63, § 42.[1]

1. *Facts.* We summarize the facts based on the board's findings that are not contested. During 1986 Grace was engaged primarily in the chemical business, which it conducted in all fifty States. It produced and marketed specialty chemicals and, to a lesser extent, agricultural chemicals. Grace's specialty chemicals business accounted for two-thirds of its earnings. Grace also had substantial interests in a variety of other businesses, including natural resources, retailing, restaurants, and other general businesses.

The board found that the businesses involved in this case were not coordinated or integrated with Grace's specialty chemical business. They were run by their own management teams, and Grace did not share expertise with them. They did no joint purchasing, research, advertising, planning, engineering, or marketing, and shared no facilities. They had no joint training programs and shared no trademarks. Transfer of personnel was limited to occasional transfers of financial personnel to newly acquired operations. Grace did provide cash management services to its subsidiaries, an arm's-length and mutually beneficial arrangement enabling both Grace and the businesses to invest at higher rates and borrow at lower rates than would be available through ordinary commercial channels.

a. *Grace's relationship to Herman's and El Torito.* Grace acquired Herman's in 1970 and operated it as a division until it

---

[1]General Laws c. 63, § 42, as appearing in St. 1969, c. 599, § 1, provides in pertinent part: "If the allocation and apportionment provisions of this chapter are not reasonably adapted to approximate the net income derived from business carried on within this commonwealth, a corporation may apply to the commissioner to have its income derived from business carried on within this commonwealth determined by a method other than that set forth in section thirty-eight."

472     58 Mass. App. Ct. 469 (2003)

W.R. Grace & Co.-Conn. *v.* Commissioner of Revenue.

was incorporated.[2] In 1985 Grace made an initial public offering (IPO) of Herman's stock and sold 46% of its common stock to the public. Grace received approximately $45 million from the sale and reported it as apportionable income on its 1985 Massachusetts excise tax return.

Prior to the IPO, Grace provided various financial, administrative, legal, and staff functions and services to Herman's at no cost. In March, 1985, following the IPO, Grace and Herman's entered into a services agreement which identified services Grace would provide to Herman's at an arm's-length charge. These included legal and patent services, corporate risk management, participation in Grace's cash management program, human resources, internal auditing,[3] and electronic data processing services. Additionally, after Herman's went public, Herman's, not Grace, made matching contributions to a savings and investments plan for Herman's employees; Herman's stock options plan substituted options in Herman's stock for options in Grace's stock; Herman's funded its employees' participation in its retirement plan for salaried employees; and cash deposits by Herman's and cash advances to Herman's by Grace were no longer interest free, but carried interest at one-quarter of one percent above Grace's commercial paper borrowing rate and were payable on demand.

Grace acquired El Torito in 1976 and sold approximately 26% of its common stock to the public in an IPO in 1984. After El Torito became a public company, it entered into a services agreement with Grace similar to the services agreement entered into by Grace and Herman's. Like Herman's, El Torito funded contributions to retirement plans in which employees continued to participate after the public offering, and also, as with Herman's, cash advances from and to Grace bore interest at one-quarter of one percent above Grace's thirty-day commercial paper rate.

b. *The sales.* In 1985, Grace's largest shareholder announced

[2]There was conflicting information concerning the date of Herman's incorporation. It was clear, however, that by March, 1985, Herman's was incorporated.

[3]An exception was made for "work performed by the Internal Auditing Department of Grace at the request of the management of Grace in the ordinary course of its supervision of its investment in Herman's."

that it would sell its 26% stock interest in Grace. Grace, fearing that the sudden availability of such a large block of shares of its stock in the market could lead to a sharp decline in the stock's value and, possibly, a hostile takeover, determined to purchase the block of shares itself. Grace made the sales at issue in order to finance this transaction. Approximately two-thirds of the gain from the sales arose from the sale of stock in Herman's.[4]

2. *Analysis.* "The due process clause of the Fourteenth Amendment imposes two requirements for State taxation of income generated by interstate activities: a minimal connection or nexus between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise. The 'linchpin of apportionability' is the 'unitary-business principle.' *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont*, 445 U.S. 425, 439 (1980). If a company is a unitary business, then a State may apply an apportionment formula to the taxpayer's total income in order to obtain a rough approximation of the corporate income that is reasonably related to the activities conducted within the taxing State. We have upheld apportionment under G. L. c. 63, § 38, in such cases, unless the taxpayer 'bears the burden of showing by clear and cogent evidence' that apportionment 'resulted in extraterritorial values being taxed.' " *Becton, Dickinson & Co.* v. *Department of Rev.*, 383 Mass. 786, 788-789 (1981), quoting from *Grace I*, 378 Mass. at 586 (citations omitted).[5]

Beginning in the early 1980's, the United States Supreme Court issued a series of decisions enunciating principles for determining whether a unitary business exists. See *Allied-Signal, Inc.* v. *Director, Div. of Taxn.*, 504 U.S. at 780-783, reviewing these decisions. The Court established that "the constitutional

---

[4]Grace derived a net gain of $179,204,462 from the Herman's sale; $59,027,858 from the Channel/Central sale; and $36,010,226 from the restaurant group sale.

[5]The existence of a unitary enterprise "is one means of meeting the constitutional requirement." *Allied-Signal, Inc.* v. *Director, Div. of Taxn.*, 504 U.S. at 787. In the absence of a unitary enterprise, apportionment is justified if "the capital transaction serve[s] an operational rather than an investment function." *Ibid.* The parties and the board grounded their positions in this case on the unitary business issue.

test focuses on functional integration, centralization of management, and economies of scale," factors which continue to be "hallmarks" of a unitary business. *Id.* at 783, 789. The board analyzed these factors and determined that "there was little to no 'functional integration, centralization of management, and economies of scale' which, under the prevailing U.S. Supreme Court analysis, could justify the taxation of the gains [Grace] realized from the subsidiaries at issue in this appeal."[6]

a. *Standard of review.* The board's determination included findings of fact, which we accept if supported by substantial evidence, and conclusions, which we accept if consistent with the board's findings and with the governing law. See *Becton, Dickinson & Co.* v. *Department of Rev.*, 383 Mass. at 789; *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. 505, 511 (2002). Recognizing the board's expertise in tax matters, we give its decision "some deference." *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993), quoting from *McCarthy* v. *Commissioner of Rev.*, 391 Mass. 630, 632 (1984).

b. *The issue of centralized management.* The commissioner concedes that each subsidiary had its own management team.

---

[6]In its decision in *Grace I*, 378 Mass. at 584-587, the Supreme Judicial Court concluded that Grace and a subsidiary not involved in this case constituted a unitary business and held that capital gains Grace derived from the sale of stock in the subsidiary were subject to apportionment under G. L. c. 63, § 38. The *Grace I* decision employed a unitary analysis that differed in several respects from the analysis subsequently established by the Supreme Court. For example, the court observed in *Grace I* that "[c]lose functional integration . . . is not an essential element of unitariness," *id.* at 587, whereas the Supreme Court deemed it an "essential[]." *Allied-Signal*, 504 U.S. at 789. Additionally, *Grace I* focused on the importance of the taxpayer's *potential* for operational control of its subsidiary. *Id.* at 587. The Supreme Court, while recognizing that the potential for operational control remains relevant, *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U.S. 159, 177 n.16 (1983), determined that it "is not dispositive when . . . the . . . income from the subsidiaries *in fact* is 'derive[d] from unrelated business activity' which constitutes a 'discrete business enterprise.' " *F.W. Woolworth Co.* v. *Taxation & Rev. Dept. of N.M.*, 458 U.S. 354, 362 (1982), quoting from *Exxon Corp.* v. *Wisconsin Dept. of Rev.*, 447 U.S. 207, 223-224 (1980). Finally, *Grace I* cited *American Smelting & Ref. Co.* v. *Idaho State Tax Commn.*, 99 Idaho 924, 937 (1979), for the concept that "[t]he focus of the inquiry should be on the purpose and use of the stock by Grace prior to its disposition." *Grace I, supra* at 583. The Supreme Court overturned *American Smelting & Ref. Co.* in *ASARCO Inc.* v. *Idaho State Tax Commn.*, 458 U.S. 307 (1982), rejecting as too broad Idaho's conception of a unitary business. *Id.* at 326.

He contends, however, that the board failed to consider that the subsidiaries frequently reported to Grace and sought its approval on various matters, that many of the subsidiaries' officers were former Grace employees, and that Grace and the subsidiaries had common directors. Since the board, the commissioner argues, failed to "consider[] . . . the entire record" as it was required to do, *New Boston Garden Corp.* v. *Board of Assessors of Boston*, 383 Mass. 456, 466 (1981), its determination that there was no centralized management was not supported by substantial evidence.

Contrary to the commissioner's argument, the board did in fact take into account that Grace exercised some supervision of the subsidiaries, but it concluded that Grace exercised the kind of oversight that a parent would typically give to an investment in a subsidiary. The Supreme Court has determined that "a unitary business finding could not be based merely on 'the type of occasional oversight — with respect to capital structure, major debt, and dividends — that any parent gives to an investment in a subsidiary.' " *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U.S. 159, 180 n.19 (1983), quoting from *F.W. Woolworth Co.* v. *Taxation & Rev. Dept. of N.M.*, 458 U.S. 354, 369 (1982). Likewise, the facts that the businesses had common directors and that some of the subsidiaries' officers were former employees of the parent do not compel the conclusion that the businesses were unitary. In *F.W. Woolworth Co.*, for example, the Court held that no unitary business existed despite the fact that Woolworth and its subsidiaries shared directors, the upper echelons of the parent's and subsidiaries' management communicated frequently, financial statements were consolidated and major financial decisions required approval by the parent. 458 U.S. at 368-369. See *United States* v. *Bestfoods*, 524 U.S. 51, 69 (1998), quoting from *Lusk* v. *Foxmeyer Health Corp.* 129 F.3d 773, 779 (5th Cir. 1997) (noting the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership").

The Supreme Court has recognized that "some managerial links" may exist between a parent and its subsidiaries without

making them part of a unitary business. *F.W. Woolworth Co.,* *supra.* The relevant question is "whether the management role that the parent does play is grounded in its own operational expertise and its overall operational strategy." *Container Corp. of America, supra* at 180 n.19. The board's findings, which set out numerous factors indicating that the businesses operated independently, supported its conclusion that they were not centrally managed.[7]

  c. *Grace's provision of cash management and other services.* " 'By its nature, a unitary business is characterized by a flow of value among its components.' . . . This flow includes . . . the flow of dividends, employee benefits, insurance, and other services from parent corporations to their subsidiaries." *Perini Corp.* v. *Commissioner of Rev.,* 419 Mass. 763, 766-767 (1995), quoting from *Kraft Gen. Foods, Inc.* v. *Iowa Dept. of Rev. & Fin.,* 505 U.S. 71, 76 (1992). The commissioner argues that Grace's centralized provision of services, including cash management, resulted in economies of scale and "a flow of values between the entities," indicating that the businesses were unitary.

  Capital transactions not undertaken at arm's length result in a "flow of value" that characterizes a functionally integrated business. *Container Corp. of America,* 463 U.S. at 180 n.19. See *Allied-Signal, Inc.,* 504 U.S. at 789. Conversely, the provision of services for which arm's-length fees are charged has been held not to result in an exchange of value characterizing a unitary enterprise. See *Hercules Inc.* v. *Commissioner of Rev.,* 575 N.W.2d 111, 116 (Minn. 1998) ("The arm's length nature of [services Hercules provided to a corporation it created] indicates that they did not embody the requisite flow of value to create a unitary business relationship"); *Hercules Inc.* v. *Comptroller of the Treasury,* 351 Md. 101, 119 (1998) (same).

  The board made detailed findings showing that after Herman's and El Torito became public companies, Grace charged them for cash management and other services on an arm's-

---

[7]The commissioner further contends that the board erroneously failed to consider the relevance of Grace's *potential* to control its subsidiaries. In fact, the board made a finding that Grace possessed such potential, but that it exercised "minimal" actual control. See note 6, supra.

length basis. Because these relationships were conducted at arm's length, they do not demonstrate that a unitary business existed.[8] With regard to Channel/Central and the restaurant chains other than El Torito, however, the board's findings do not establish the specific services Grace provided and the financial arrangements that underpinned them.[9] As to these businesses, further findings are required in order to determine whether Grace's provision of services resulted in a flow of value indicative of a unitary enterprise. It may well be that the findings and conclusions regarding the Channel/Central group and the restaurant chains other than El Torito will parallel the pattern of arrangements made between Grace, on the one hand, and Herman's and El Torito on the other, and that similar conclusions will be justified. We cannot properly assume that will be the case; the board should articulate its findings expressly.

The board's decision is affirmed with regard to Herman's and El Torito. With respect to Channel/Central and the restaurant chains other than El Torito, that portion of the decision is vacated, and the case is remanded to the board for further findings to determine whether these other businesses were unitary with Grace and the income from their sale thus subject to taxation. Grace argues that it would be entitled to have its net income calculated using an alternative method pursuant to G. L. c. 63, § 42, if a unitary business were held to exist. The board, having ruled in Grace's favor, did not reach this issue. If the board determines that a unitary business exists, it must then determine whether the net income from the sales should be

[8] The establishment of these arm's-length relationships *subsequent* to the IPOs is particularly significant in view of the board's finding that when Grace made its initial IPO of Herman's stock in 1985, it reported its gain from the sale as apportionable income on its 1985 Massachusetts excise tax return.

[9] The commissioner's brief states that, in addition to cash management services, Grace provided the subsidiaries a variety of other services, in areas such as corporate risk management, human resources, reporting processing and systems, investor and shareholder relations, patents, internal auditing and retail group electronic data processing, legal services, tax return preparation, savings incentive programs, and participation in its pension plans. However, the brief relies for this information on record references to Herman's and El Torito. The nature of the services provided to the other businesses and the financial arrangements involved remain unclear.

calculated according to the apportionment formula set out in G. L. c. 63, § 38, or by using an alternative method pursuant to G. L. c. 63, § 42.

*So ordered.*