General Mills, Inc., & others[1] *vs.* Commissioner
of Revenue.

Suffolk. May 8, 2003. - September 15, 2003.

Present: Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Taxation,* Abatement, Corporation, Excise, Corporate excise, Apportionment
of tax burden, Related corporations. *Corporation,* Subsidiary, Stock. *Trade
Name. Trademark.*

The Appellate Tax Board, in ordering an abatement and refund of the taxpayer
corporation's corporate excise tax paid on the gain it realized from the sale
of the stock of a subsidiary, committed no error of law in deciding that
there was no unitary business relationship between the taxpayer and the
subsidiary and properly applied the test used to determine the existence of
such a relationship. [161-166]

The Appellate Tax Board correctly determined that the gain on the sale of the
stock of the taxpayer corporation's subsidiary was properly included in the
subsidiary's Massachusetts gross income on its combined Massachusetts
income tax return with the taxpayer, where both the taxpayer and the
subsidiary had made an election under I.R.C. § 338(h)(10), 26 U.S.C.
§ 338(h)(10) (1988), to treat the sale of the stock as a sale of the
subsidiary's assets and consequently reported that sale on their Federal
consolidated tax return as income to the subsidiary. [166-171]

The Appellate Tax Board correctly determined that the gain from the sale of
the trademarks and trade names of a subsidiary of the corporate taxpayer
by a subsidiary of the subsidiary was taxable to the subsidiary because an
earlier transfer of its trademarks and trade names to the subsidiary of the
subsidiary lacked economic substance beyond the mere creation of tax
benefits [171-174], and that the gain from the sale of the trademarks and
trade names was properly included in the numerator of the apportionment
formula used to calculate the subsidiary's additional tax liability [174-176].

Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Paul H. Frankel,* of New York (*Craig B. Fields,* of New
York, & *Maxwell D. Solet* with him) for the taxpayers.

*Thomas K. Condon,* Special Assistant Attorney General

[1]Talbots, Inc., and Eddie Bauer, Inc.

*(Michael T. Fatale*, Special Assistant Attorney General, with him) for Commissioner of Revenue.

SPINA, J. In 1988, General Mills, Inc., a Delaware corporation doing business in Massachusetts, sold its interest in two wholly owned subsidiaries: Eddie Bauer, Inc., a foreign corporation, and Talbots, Inc., a Massachusetts corporation. The corporations paid corporate excise taxes assessed and self-assessed for the fiscal year involved, then filed an application for abatement with the Commissioner of Revenue (commissioner). The application was denied. Three items for which abatement was sought are the subject of this appeal. The first involved an apportionable tax assessed to General Mills, after audit, on the gain it realized from the sale of its Eddie Bauer stock, where the commissioner determined that Eddie Bauer functioned as part of General Mills's unitary business in Massachusetts. The second involved a self-assessed tax based on income that Talbots had reported, allegedly in error, as its own but in fact was the gain realized by General Mills from the sale of its Talbots stock, where both corporations had joined the purchaser of the stock in an election under I.R.C. § 338(h)(10), 26 U.S.C. § 338(h)(10) (1988), to treat the stock sale as a sale of Talbots's assets. The third concerned an additional tax assessed on Talbots, after audit, on the gain from a sale of the Talbots trademarks and trade names (intangibles) by its wholly owned Delaware subsidiary, Tal HC, Inc. The commissioner determined that Talbots had transferred its intangibles to Tal HC five days before the sale for no consideration, for no legitimate business purpose, and solely to avoid a Massachusetts tax. He then applied the step transaction doctrine and attributed the gain directly to Talbots.

General Mills and its subsidiaries appealed to the Appellate Tax Board (board) under its formal procedure, contending that because the subsidiaries were independently run businesses and not part of General Mills's unitary business in Massachusetts, the gain from the sales of stock could not, consistent with constitutional principles, be taxed. General Mills and Talbots also argued that the deemed sale of Talbots's assets could not be taxed by the Commonwealth because it was a fictitious transaction resulting from an election under the Internal Revenue

Code that was not recognized by Massachusetts and produced no income in Massachusetts. They also claimed that the transfer and ultimate sale of the Talbots intangibles could not be taxed because neither General Mills nor Talbots had received the proceeds of that sale, or alternatively, that the gain from the sale of the intangibles should be regarded as an out-of-State sale of stock.

The board found that although the three corporations did business in Massachusetts, neither subsidiary was engaged in a unitary business with General Mills in Massachusetts. The board concluded that the subsidiaries "had no rational relationship to General Mills' Massachusetts business. Therefore . . . taxing General Mills' gain realized from the sale of stock in these entities would result in the [unconstitutional] taxation of extraterritorial values." The board ordered an abatement and refund of the tax assessed on the sale of the Eddie Bauer stock.

However, because General Mills and Talbots had made an election under I.R.C. § 338(h)(10) to treat the sale of Talbots's stock as a sale of its assets and consequently reported the gain from that sale on their Federal consolidated return as income to Talbots, the board determined that the gain from that sale was properly included in Talbots's Massachusetts net income on its combined Massachusetts return with General Mills. The board also concluded that the gain from the sale of Talbots's intangibles by Tal HC was taxable to Talbots because Talbots's transfer of its intangibles to Tal HC "lacked economic substance beyond the mere creation of tax benefits," and that the commissioner properly included the gain from the sale of the intangibles in the numerator of the apportionment formula used to calculate Talbots's additional tax liability. General Mills and Talbots appealed from the portions of the board's decision pertaining to the sale of Talbots's stock and intangibles; the commissioner appealed from the decision as to the sale of the Eddie Bauer stock. We transferred the case from the Appeals Court on our own motion, and affirm the decision of the board.

1. *Facts.* The salient facts are not disputed, but some inferences drawn by the board are disputed. General Mills is a Delaware corporation with its corporate headquarters in Minneapolis, Minnesota. It is engaged in producing and selling

packaged food products at wholesale. In the early 1970's, it began to invest in existing companies in different industries. In 1971, General Mills purchased one hundred per cent of the stock of Eddie Bauer, Inc., a foreign corporation engaged in the business of retail sale of sporting goods and sports clothing, with its corporate headquarters in Seattle, Washington. In 1973, General Mills acquired one hundred per cent of the stock of Talbots, Inc., a Massachusetts corporation with corporate headquarters in Hingham. Talbots is a clothing retailer and catalog sales company. In 1988, General Mills sold its interest in both companies. At all relevant times the three companies did business in Massachusetts.

a. *Relationship between parent and subsidiaries.* The board found that, for purposes of taxation, neither Talbots nor Eddie Bauer had a unitary business relationship with General Mills because "there was no significant functional integration, centralized management or economies of scale realized by [General Mills] and its subsidiaries."[2] During General Mills's ownership of Eddie Bauer and Talbots, Eddie Bauer had its own senior management responsible for preparing its own budget and running its business from the State of Washington. Talbots also had its own management team, which conducted its affairs from Massachusetts. Each subsidiary had its own employees and administered its own employee related functions, such as training, payroll, and benefits. Each managed its own purchasing, inventory, site selection, and research functions, separate from General Mills. And each maintained its own administrative offices, warehouses, and retail stores, none of which was shared with General Mills. The two subsidiaries shared no centralized purchasing or advertising functions with the parent. Although General Mills and its subsidiaries shared some officers and directors, it was sporadic and they had no involvement in the day-to-day operations of the subsidiaries.

General Mills provided some services to its subsidiaries. It

---

[2]The commissioner only challenges the board's finding as to Eddie Bauer, contending that the board's determination as to Talbots's relationship with General Mills, while erroneous, had no practical effect on the decision, where General Mills and Talbots made the election under I.R.C. § 338(h)(10), 26 U.S.C. § 338(h)(10) (1988).

loaned them money on an "as needed basis" with interest at commercial rates. It guaranteed a subsidiary's lease whenever required by the landlord, and it would guarantee revenue bonds to finance major capital projects undertaken by a subsidiary. It permitted a subsidiary's employee pension plan to invest in General Mills's pooled retirement funds. General Mills provided legal and tax services to its subsidiaries, charging a pro rata share of the legal fees. It did not charge either subsidiary a fee for the tax service because the New York Stock Exchange and the Securities and Exchange Commission (SEC) required wholly owned subsidiaries to file tax returns on a consolidated basis with the parent corporation. Consequently, General Mills decided that it was more efficient and practical to have the necessary returns prepared by the same tax expert, and it absorbed the entire cost.

General Mills provided administrative support to Talbots and Eddie Bauer through its "specialty retailing group" (SRG) staffed at various times by fifteen to eighteen employees on General Mills's payroll. The SRG assisted the subsidiaries in preparing requests for funding from General Mills for major capital projects, and in the preparation of financial and operational reports required by General Mills, as well as other areas of management. The cost of maintaining the SRG, which was located in New York, was borne by the subsidiaries. General Mills provided each subsidiary, cost free, use of the other's proprietary customer list. Talbots's list was "one of the most sought after, highest performing and accurately addressed lists in the industry."

In its 1979 stock prospectus, General Mills represented that "it produce[d] and [sold] apparel, accessories and other fashion items . . . and recreational shoes." In its SEC Form 10-K and annual report for 1986, it represented that it was engaged in competition in three industry areas, including "Specialty Retailing." In its 1987 annual report, General Mills stated that Eddie Bauer was one of its "Major Growth Businesses" and that Talbots was one of its "three core businesses," which collectively generated forty-six per cent of the company's total 1987 income.

  b. *Sale of Talbots's stock.* On May 18, 1988, following

negotiations with Jusco Co., Ltd. (JCL), General Mills entered into an agreement with Jusco (U.S.A.), Inc., a Delaware subsidiary of JCL, for the purchase and sale of Talbots's stock. The parties agreed that General Mills would receive $3 million as consideration for joining with JCL, if requested, in an election under I.R.C. § 338(h)(10) to treat the sale of Talbots's stock as a sale of its assets. The $3 million figure was based on an estimate of the increased Federal tax liability that would result from such an election, and the understanding that there would be no State tax liability.

On May 30, 1988, JCL sought a modification to the agreement, for its own purposes. It proposed that "[i]mmediately prior to the sale of Talbots shares by General Mills, Talbots will sell [its] trademark/tradename intangibles to Jusco (Europe), B.V., in the Netherlands [another JCL subsidiary] for a purchase price to be based on an evaluation by [the accounting firm] Touche Ross, which will be deducted from the total US $325 million to be paid for Talbots shares." General Mills agreed, subject to a determination of increased tax liabilities and a satisfactory indemnification agreement.

On June 9, 1988, in response to General Mills's concern that the proposed sale of Talbots's intangibles to Jusco (Europe) would create a taxable dividend in Massachusetts, JCL proposed an alternative plan to eliminate any potential Massachusetts tax to General Mills. Under the alternative plan, Talbots would create a Delaware corporation to which it would transfer its zero basis intangibles. The new corporation would then sell the intangibles to Jusco (Europe) for $100 million. The consideration for the sale of Talbots's stock would be $325 million. After the sale of the stock, the new corporation, which would then be controlled by Jusco (U.S.A.), would lend to Jusco (U.S.A.) the $100 million proceeds from the sale of intangibles. Jusco (U.S.A.) would use the money to pay down the $325 million loan it obtained to acquire the Talbots stock. It was understood that by shifting the taxable transaction for the sale of Talbots's intangible assets from Massachusetts to Delaware, there would be no Massachusetts tax on the gain, and because there is no income tax in Delaware, General Mills would incur no State tax from the sale of Talbots's intangibles. At some future date, the

new Delaware corporation would be liquidated. General Mills agreed to the alternative plan. Because it understood that Massachusetts might challenge the scheme, General Mills initially requested a hold harmless agreement but abandoned that request when it became satisfied that the alternative plan was tax neutral.

The alternative plan to sell the Talbots intangibles was carried out. On June 17, 1988, General Mills incorporated Tal HC, Inc., a Delaware corporation, as a wholly owned subsidiary of Talbots. Talbots assigned its intangibles to Tal HC on June 21, 1988. Tal HC licensed the intangibles back to Talbots[3] the same day with no provision for royalty payments. On June 26, 1988, Tal HC sold the Talbots intangibles to Jusco (Europe) for $100 million. Prior to that date, Tal HC had no employees and no liabilities. Its assets consisted of the Talbots intangibles and ten dollars it received from Talbots for Tal HC's stock. Its only business activities during this time were those just described. Also on June 26, Jusco (Europe) licensed the Talbots intangibles back to Talbots. That licensing agreement contained a provision for royalty payments based on a percentage of sales. Jusco (Europe) received royalty payments from Talbots that averaged more than $24,000 each day from July, 1988, through December, 1988. Tal HC had received no royalty payments for the six days it owned the intangibles.

On June 27, 1988, General Mills sold its Talbots stock to Jusco (U.S.A.) for $325 million. After the sale Tal HC, which was then controlled by Jusco (U.S.A.) by virtue of its ownership of Talbots's stock, loaned to Jusco (U.S.A.) the $100 million that it received from Jusco (Europe) on June 26, 1988. Jusco (U.S.A.) applied the $100 million to the $325 million loan it obtained to acquire the Talbots stock. These steps were taken pursuant to JCL's June 9, 1988, alternative plan. Approximately nine months later, General Mills and Talbots joined Jusco (U.S.A.) in an election under I.R.C. § 338(h)(10). Consequently, General Mills filed a 1989 Federal consolidated return and a combined Massachusetts return that both treated the sale of Talbots's stock as a sale of assets by Talbots. General Mills reported Tal HC's sale of Talbots's intangibles on the

---

[3]The licensing agreement was considered necessary to protect the trademarks and trade names.

consolidated Federal return as a direct sale of assets by Tal HC. It could not include the sale of intangibles in the I.R.C. § 338(h)(10) election because it took place the day before the sale of Talbots's stock.

2. *Sale of the Eddie Bauer stock.* The commissioner contends that the board erroneously determined that there was no unitary business relationship between General Mills and Eddie Bauer and misapplied the test used to determine the existence of such a relationship. Findings of the board are final, see G. L. c. 58A, § 13, and will not be disturbed if they are supported by sufficient evidence. "Our review of the sufficiency of the evidence is limited to 'whether a contrary conclusion is not merely a possible but a necessary inference from the findings.' " *Olympia & York State St. Co.* v. *Assessors of Boston,* 428 Mass. 236, 240 (1998), quoting *Kennametal, Inc.* v. *Commissioner of Revenue,* 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998). The credibility of witnesses, the weight of the evidence, and inferences that reasonably may be drawn from the evidence are matters for the board. See *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 43 n.6. If the decision of the board is supported by sufficient evidence, it will not be set aside unless it is based on an error of law. See *Syms Corp.* v. *Commissioner of Revenue,* 436 Mass. 505, 511 (2002).

As a general rule, the commerce clause and the due process clause of the United States Constitution prohibit a State from imposing a tax on value earned outside its borders. See *ASARCO Inc.* v. *Idaho State Tax Comm'n,* 458 U.S. 307, 315 (1982). However, a State may tax a nondomiciliary corporation on an apportionable share of its interstate business provided there is a " 'minimal connection' or 'nexus' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.' "[4] *Exxon Corp.* v. *Department of Revenue of Wis.,* 447 U.S. 207, 219-220 (1980), quoting *Mobil Oil Corp.* v. *Commissioner of Taxes,* 445 U.S. 425, 436, 437 (1980). This is known as the unitary business principle. It permits a State to

---

[4]Here, because part of Eddie Bauer's own interstate business was conducted in Massachusetts, Eddie Bauer paid an apportionable tax on its income to Massachusetts.

apportionably tax a nondomiciliary corporation on income received from a subsidiary, even if the subsidiary does no business in the taxing State, provided the income is attributable to the subsidiary's operational involvement in the parent's interstate business that is subject to apportionable taxation by the State. See *Container Corp. of Am.* v. *Franchise Tax Bd.*, 463 U.S. 159, 165-166 (1983); *Mobil Oil Corp.* v. *Commissioner of Taxes*, *supra* at 438.

The test used to determine the existence of a unitary business relationship between a corporation and its subsidiary for purposes of assessing an apportionable tax focuses on whether "contributions to income result[] from functional integration, centralization of management, and economies of scale." *Id.* See *Container Corp. of Am.* v. *Franchise Tax Bd.*, *supra* at 179. The United States Supreme Court has not decided whether any one factor under this test would be sufficient to establish the existence of a unitary business. *Id.* at 179-180. A State may not tax a nondomiciliary corporation's income that is derived from a subsidiary's unrelated business activity that constitutes a discrete business enterprise. See *id.* at 166; *Mobil Oil Corp.* v. *Commissioner of Taxes*, *supra* at 439, 442. The burden is on the taxpayer to show "by 'clear and cogent evidence' that [the State tax] results in extraterritorial values being taxed." *Container Corp. of Am.* v. *Franchise Tax Bd.*, *supra* at 164, quoting *Exxon Corp.* v. *Department of Revenue of Wis.*, *supra* at 221.

The commissioner contends that the "centralized management" test was satisfied by the management direction that General Mills provided to Eddie Bauer through its hierarchical SRG staffed by General Mills officers; by the guidelines imposed on Eddie Bauer that determined key issues, corporate strategy, and economic targets; and by the officers and directors that they shared. We disagree. Although there were "some managerial links" between the companies, they were insufficient to establish the level of integration needed for the existence of a unitary business. *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M.*, 458 U.S. 354, 368 (1982).

Contrary to the commissioner's assertions, General Mills did not, either directly or through the SRG, involve itself in the operational management of either subsidiary or establish busi-

ness guidelines for them. Although nine officers and directors served both General Mills and Eddie Bauer at different times during portions of the corporate fiscal years ending May, 1976, 1977, 1988, and 1989, the uncontroverted evidence was that they did not participate in the day-to-day management of Eddie Bauer or interject themselves into the business decisions of its management. See *id.* at 368-369 (sporadic participation of common directors at board meetings insufficient to establish unitary relationship). The SRG did not direct the management of Eddie Bauer or Talbots to do anything. It was not involved in the day-to-day management of either subsidiary and it did not oversee any of their operations. *Id.* The primary purpose of the SRG was to provide administrative support to the subsidiaries and coordinate their requests for major capital funding for review by General Mills. The board found that the benefits that the subsidiaries received from the SRG were minimal, and that they bore the cost of the services provided to them. Contrast *Container Corp. of Am.* v. *Franchise Tax Bd., supra* at 180 n.19. After Eddie Bauer and Talbots were both sold, most employees of the SRG lost their jobs precisely because they were not part of General Mills's management team, and the senior management staff of Eddie Bauer remained with Eddie Bauer after the sale. The economic "performance targets" that General Mills set for the subsidiaries were not operational guidelines that dictated the internal workings of the subsidiaries, but instead were the type of performance demands that the sole shareholder of any business corporation would make in overseeing its investment. Such evidence does not compel a finding that a unitary relationship existed. See *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M., supra* at 369. The key issues and corporate strategies needed to attain those levels of performance were determined autonomously by management of the subsidiaries, persuasive evidence that Eddie Bauer and Talbots operated independently of General Mills and that no centralized management existed between them. See *id.* at 364-365.

The commissioner correctly observes that "mere decentralization of day-to-day management responsibility and accountability cannot defeat a unitary business finding," *Container Corp. of Am.* v. *Franchise Tax Bd., supra* at 180 n.19, citing *Exxon Corp.*

v. *Department of Revenue of Wis., supra* at 224. However, it is also true that "a unitary business finding could not be based merely on 'the type of occasional oversight — with respect to capital structure, major debt, and dividends — that any parent gives to an investment in a subsidiary.' " *Container Corp. of Am.* v. *Franchise Tax Bd., supra,* quoting *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M., supra* at 369. "The difference lies in whether the management role that the parent does play is grounded in its own operational expertise and its overall operational strategy." *Container Corp. of Am.* v. *Franchise Tax Bd., supra* at 180 n.19. "[T]he proper inquiry looks to 'the underlying unity or diversity of business enterprise,' [*Mobil Oil Corp.* v. *Commissioner of Taxes, supra* at 440], not to whether the nondomiciliary parent derives some economic benefit — as it virtually always will — from its ownership of stock in another corporation. [*ASARCO Inc.* v. *Idaho State Tax Comm'n, supra* at 325-329]." *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M., supra* at 363-364. There is no evidence that General Mills interjected its operational expertise of the wholesale food industry into the management of Eddie Bauer, a business oriented toward retail sales of sports clothing and sporting goods. Similarly, there is no evidence that General Mills imposed the over-all operational strategy used in its wholesale food business onto Eddie Bauer. There is, as discussed above, sufficient evidence to support the board's findings that there was no centralized management between General Mills and its subsidiaries.

The commissioner next contends that the board misapplied the "functional integration" and "economies of scale" tests, arguing that under *Container Corp. of Am.* v. *Franchise Tax Bd., supra* at 178, the "ultimate issue is whether there was a 'flow of value' between General Mills and [Eddie] Bauer." His understanding of *Container Corp.* is flawed. The commissioner's approach would produce a unitary business finding in virtually every case, as there will almost always be some flow of value through unity of ownership. His approach has been rejected by the Supreme Court. See *Container Corp. of Am.* v. *Franchise Tax Bd., supra* at 178-179; *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M., supra* at 363-364; *ASARCO Inc.* v.

*Idaho State Tax Comm'n, supra* at 325-328. Although there must be a "flow of value," there also must be some "underlying unity . . . of business enterprise," *Mobil Oil Corp.* v. *Commissioner of Taxes, supra* at 440, some "substantial mutual interdependence," *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M., supra* at 371. See *Container Corp. of Am.* v. *Franchise Tax Bd., supra.*

The "flow of value" on which the· commissioner relies, namely, the ability of Eddie Bauer to borrow funds from General Mills on an as-needed basis and the cost-free provision of cash management services, either does not arise from a unity of business enterprise or is unsupported by the record.[5] All loans to the subsidiaries were arm's-length transactions at commercial rates; and, except for absorbing the entire cost of preparing the consolidated tax returns required by the SEC and the New York Stock Exchange, General Mills charged Eddie Bauer for the cost of all services provided. These facts do not support a finding that the businesses were functionally integrated. See *W.R. Grace & Co.-Conn.* v. *Commissioner of Revenue,* 58 Mass. App. Ct. 469, 476 (2003). There is no evidence that these transactions served an operational function of General Mills. Rather, the transactions are consistent with the existence of an investment function. Contrast *Container Corp. of Am.* v. *Franchise Tax Bd., supra* at 180 n.19. Where, as here, a parent invests in a subsidiary that engages in a business truly distinct from that of the parent, it is less likely that the two enterprises will coordinate functions by operational integration, sharing expertise, or economies of scale. See *id.* at 178. The record does not support the commissioner's claim that Eddie Bauer received cash management services from General Mills, or that such services were provided to Eddie Bauer on a cost-free basis. The record does support the board's finding that the few services

---

[5]The commissioner does not argue that the capital transaction here was taxable because General Mills intended it to be a source of working capital and was therefore an operational function of General Mills's unitary business rather than a passive investment unrelated to its multistate business in Massachusetts. See *Allied-Signal, Inc.* v. *Director, Div. of Taxation,* 504 U.S. 768, 787 (1992); *Container Corp. of Am.* v. *Franchise Tax Bd.,* 463 U.S. 159, 180 n.19 (1983).

that General Mills did provide to Eddie Bauer served an investment function, not an operational function. See *id.* at 180 n.19.

Finally, the commissioner argues that General Mills held itself out in its combined annual reports as having actual control over the operations of Eddie Bauer, and that such statements are sufficient to establish a unitary relationship. See *Becton, Dickinson & Co.* v. *Department of Revenue*, 383 Mass. 786, 789 (1981). The board declined to make such a finding, citing *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M.*, supra at 369 (publication of "annual reports . . . on a consolidated basis" alone is not controlling). Moreover, the annual reports do not compel such a finding, but rather suggest that General Mills simply was describing itself as a holding company and that Eddie Bauer was but one of many companies that it owned.

The evidence is sufficient to support the board's findings that Eddie Bauer was acquired by General Mills as an investment and treated as such, that it was not operationally integrated into General Mills's wholesale food business but instead operated as an independent business, and that General Mills's occasional involvement in the management of Eddie Bauer was "more akin to [that of] a parent company's oversight of its investment in a subsidiary." See *F.W. Woolworth Co.* v. *Taxation & Revenue Dep't of N.M.*, supra at 369 ("Except for the type of occasional oversight — with respect to capital structure, major debt, and dividends — that any parent gives to an investment in a subsidiary, there is little or no integration of the business activities or centralization of the management of these . . . corporations"); *Container Corp. of Am.* v. *Franchise Tax Bd.*, supra at 166 (there must be "some sharing or exchange of value not capable of precise identification or measurement — beyond the mere flow of funds arising out of a passive investment or a distinct business operation"). The board did not commit an error of law in deciding that there was no unitary business relationship between General Mills and Eddie Bauer, and we will not disturb that decision.

3. *Sale of the Talbots stock.* General Mills and Talbots argue that the election under I.R.C. § 338(h)(10) to treat the sale of Talbots's stock as a sale of its assets for Federal tax purposes is a "fiction" that should not control the Massachusetts determina-

tion of gross income under G. L. c. 63, § 30,[6] and that Massachusetts does not recognize the election under § 338(h)(10).[7,8] They concede that "[g]enerally, a corporation's Massachusetts income, with certain exceptions, starts with its [F]ederal taxable income." See *PMAG, Inc.* v. *Commissioner of Revenue*, 429 Mass. 35, 39 (1999). They rely on *Rohrbough, Inc.* v. *Commissioner of Revenue*, 385 Mass. 830, 832 (1982), where the court said: "Although the figure shown as gross income on a taxpayer's Federal return will normally be the gross income for State tax purposes for the same tax year, *this is not always the case*" (emphasis added), and Weston Marketing Corp. *vs.* Commissioner of Revenue, Appellate Tax Board No. 161893 (1994), aff'd, 40 Mass. App. Ct. 1108 (1996), which they describe as "another instance in which Massachusetts gross income was different from [F]ederal gross income because of a fictional transaction prescribed by [F]ederal tax law."[9] However, neither case holds that a "fictional" treatment of gross income prescribed by Federal tax law may not be used to determine gross income for Massachusetts tax purposes, or that Massachusetts does not recognize the particular "fictional" treatment of gross income under I.R.C. § 338(h)(10).

---

[6]"Gross income" is "gross income as defined under the provisions of the Federal Internal Revenue Code, as amended and in effect for the taxable year," with certain adjustments not relevant here. G. L. c. 63, § 30 (3).

[7]General Mills and Talbots argued before the board that "[t]he § 338(h)(10) election does not confer jurisdiction to tax where none exists," and that the tax on the deemed sale of assets was a violation of the due process clause of the Federal Constitution. They have not argued this issue on appeal, and it is deemed waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975); *Boston Hous. Auth.* v. *Guirola*, 410 Mass. 820, 827 n.9 (1991).

[8]The commissioner argues that General Mills and Talbots have raised their statutory claim for the first time on appeal, and that we should disregard it. See G. L. c. 58A, § 13; *Gillette Co.* v. *Commissioner of Revenue*, 425 Mass. 670, 684 (1997). We are satisfied that the issue was raised in the petition to the board. Moreover, the board addressed the statutory issue in its decision. The issue has been preserved for appellate review.

[9]General Mills and Talbots also rely on Combustion Eng'g, Inc. *vs.* Commissioner of Revenue, Appellate Tax Board No. F228740 (2000). In that case the parent corporation reported the gain from the deemed sale of its subsidiary's assets as the income of the subsidiary, and did not litigate the issue that is now before us. The board agreed, without discussion, that the income from the deemed sale was properly attributed to the subsidiary. That decision, therefore, does not provide guidance.

In the *Rohrbough* case the court was presented with a differential treatment of income for Federal and State purposes that had been brought about by an election under Massachusetts law. George I. Rohrbough realized a substantial gain in 1971 from the sale of real estate in Boston. The sales price was to be paid over six years, pursuant to promissory notes. The transaction qualified for treatment as an instalment sale under I.R.C. § 453, 26 U.S.C. § 453 (1976). The Federal tax was thereby spread out over six years, as each note matured. Rohrbough elected, pursuant to G. L. c. 62, § 63 (*e*), to pay the Massachusetts tax on the entire gain with his 1971 Massachusetts individual tax return. In 1974, he transferred the remaining instalment notes for all the shares of stock of Rohrbough, Inc., a transaction that qualified as a tax free exchange under I.R.C. § 351, 26 U.S.C. § 351 (1966). Thereafter, the corporation received instalment payments that it reported on its Federal returns. It did not report the payments on its Massachusetts returns because Rohrbough had paid the Massachusetts income tax due on the entire gain with his 1971 individual return. The commissioner assessed a tax on these payments and denied the corporation's applications for abatement. The corporation appealed to the board, which ruled that it was entitled to the abatements. *Rohrbough, Inc.* v. *Commissioner of Revenue, supra* at 830-831. The court affirmed the decision of the board, holding that where the State tax on the gain had been fully paid in 1971 pursuant to an election under G. L. c. 62, § 63 (*e*), the commissioner could not impose what amounted to a double tax on the gain. *Id.* at 831. The court construed the reference to gross income in G. L. c. 63, § 30, as a reference "to the provisions of the Internal Revenue Code and not simply to the amount of gross income shown on a taxpayer's Federal income tax return for the same tax year." *Id.* at 832. The original differential treatment of the gain by Rohrbough for Federal and State purposes was specifically permitted by G. L. c. 62, § 63 (*e*), and the court applied various provisions of the Internal Revenue Code to preserve that treatment for his successor in interest.

Weston Marketing Corp. *vs.* Commissioner of Revenue, *supra*, is similar, but the differential treatment of income in that

case was, by statute, mandatory, and amounted to nonrecognition of income. In that case the taxpayer was a corporation that had elected Subchapter S status for Federal tax purposes. It had acquired certain regulated futures contracts on which it was required, pursuant to I.R.C. § 1256, 26 U.S.C. § 1256 (1981), to recognize any gain or loss at market value on the last day of the year. On December 31, 1981, the aggregate market value of the taxpayer's futures contracts was less than its cost, and pursuant to § 1256, it reported a loss on its Federal tax return. However, it was not permitted to take the loss on its Massachusetts return because Massachusetts did not recognize Subchapter S corporations at the time. See G. L. c. 62, § 2, as appearing in St. 1973, c. 723, § 2.[10] In 1982 the taxpayer sold some of its futures contracts and reported a gain on its 1982 Federal return that reflected a recapture of the loss reported on its 1981 Federal return. It also reported a gain on its 1982 Massachusetts return, but that gain did not include the recaptured loss from 1981 because the taxpayer could not and did not claim the loss on its 1981 Massachusetts return. The board rejected the commissioner's argument that, as matter of law, a taxpayer's Massachusetts gross income will be the same as the amount shown on its Federal return. It ruled instead that it must look to the provisions of the Internal Revenue Code to determine a taxpayer's gross income, citing *Rohrbough, Inc.* v. *Commissioner of Revenue, supra.* The board noted that I.R.C. § 111(a), 26 U.S.C. § 111(a) (1980), in effect at the time, excluded from gross income "income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed." Weston Marketing Corp. *vs.* Commissioner of Revenue, *supra* at 6. It concluded that where the taxpayer appellant "did not have the benefit of the loss for Massachusetts purposes, there is no logical or statutory basis for recapturing that loss for Massachusetts purposes." *Id.*

There is no merit to the claim that Massachusetts does not

---

[10]The income and loss pass-through features available to Subchapter S corporations for Federal tax purposes were expressly not recognized in Massachusetts until 1986, four years after the sale in question. See St. 1986, c. 488, §§ 72, 74. See also *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 551 (1993).

recognize the election under I.R.C. § 338(h)(10). General Laws c. 63, § 30, operates to include all gross income determined under the Internal Revenue Code, except income that is expressly excluded. There is no statute that denies recognition of an election under § 338(h)(10) or otherwise excludes income resulting from such an election from the application of G. L. c. 63, § 30. See *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 551 (1993); Weston Marketing Corp. *vs.* Commissioner of Revenue, *supra.* The election is therefore recognized. Similarly, differential treatment of income requires specific statutory authority, as in *Rohrbough,* and General Mills and Talbots cite no statute that permits or requires differential treatment of Talbots's Federal and State gross income. We also note that neither General Mills nor Talbots has been exposed to double taxation, as was the taxpayer in *Rohrbough,* nor has either been assessed a tax on a benefit that was not received, as occurred in the Weston Marketing case.

We are not persuaded that the gain resulting from the "fiction" should not be taxed because it produced no income in Massachusetts. A gain actually was realized from the sale of the Talbots stock. Had Talbots actually sold its assets, there can be no doubt that the gain would have been taxable in Massachusetts. The "fiction" created by I.R.C. § 338(h)(10) simply allowed the parties to change the means by which the gain was realized and by whom. It permitted General Mills and Talbots to elect which of them would report that gain on its portion of their consolidated Federal return. Because they elected to have Talbots report the gain, the gross income on Talbots's Federal tax return increased by the amount of the gain, precisely as if it had sold its assets and produced income in Massachusetts; and General Mills's gross income was correspondingly reduced, as if it had never sold its Talbots stock. There was nothing "fictional" about the effect of the election for Federal tax purposes. Talbots became liable for a Federal tax on the gain. Moreover, the tax would not simply be the same amount that General Mills would have paid had the election not been made. As a result of the election, General Mills effectively dropped out of the picture, and the tax would be based on Talbots's separate return, which amounted to approximately $3

million more than General Mills would have paid. Those nonfictional consequences had been anticipated and adjustments were made during negotiations between General Mills and JCL. The election also produced Massachusetts tax consequences consistent with the Federal treatment of the gain. See *Dow Chem. Co.* v. *Commissioner of Revenue*, 378 Mass. 254, 264 (1979). There is no suggestion that this approach will cause confusion among the States and lead to double taxation. Because § 338(h)(10) treated the gain from the deemed sale of Talbots's assets as includable in its Federal gross income, the literal wording of G. L. c. 63, § 30, requires that it also be included in Talbots's Massachusetts gross income. See *id.* The board correctly determined that the gain from the deemed sale was includable in Talbots's Massachusetts gross income.[11]

4. *Sale of intangibles.* The board found that "the creation of Tal HC, the transfer of Talbots' intangibles and the subsequent sale by Tal HC, lacked economic substance . . . beyond the mere creation of tax benefits." It applied the "step transaction doctrine" and concluded that "[n]otwithstanding the form of the transaction, its substance was the direct sale of the intangibles by Talbots." General Mills and Talbots argue that the board's decision is not supported by the record, and that the transaction had a valid business purpose and economic substance beyond the creation of tax benefits. They contend that the transaction was in furtherance of General Mills's over-all business purpose to sell the Talbots stock, that JCL structured the transaction in a manner that would transfer the trademarks to a foreign affiliate in order to obtain certain advantages in the international market and advantages under certain international accounting practices,

---

[11]General Mills and Talbots submitted a postargument letter pursuant to Mass. R. A. P. 16 (I), as amended, 386 Mass. 1247 (1982), citing supplemental authorities, *Canteen Corp.* v. *Commonwealth*, 792 A.2d 14 (Pa. Commw. Ct. 2002), and Osram Sylvania, Inc. *vs.* Commonwealth, No. 310 F.R. 1998 (Pa. Commw. Ct. Mar. 6, 2003). These cases do not support their claim. The question before the court was whether the gain from a deemed sale of assets pursuant to an election under I.R.C. § 338(h)(10) was taxable as business income or nonbusiness income under Pennsylvania law. Nonbusiness income is taxed at a lower rate. The subsidiary had reported the gain from the deemed sale as nonbusiness income on its return. The court concluded that the gain was taxable as nonbusiness income. Apropos to this case, the gain was both reportable by and taxable to the subsidiary.

and that pursuant to the terms of the purchase and sale agreement General Mills was required to accommodate JCL.

The step transaction doctrine is a rule that, for purposes of taxation, looks to the substance of a transaction over its form. See *Commissioner of Revenue* v. *Dupee*, 423 Mass. 617, 624 (1996), quoting 11 Mertens, Federal Income Taxation § 43.253, at 347 (1995). It "treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result." *Penrod* v. *Commissioner*, 88 T.C. 1415, 1428 (1987). See *Commissioner of Internal Revenue* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction. . . . A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title"); *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938) ("A given result at the end of a straight path is not made a different result because reached by following a devious path"). "Thus, the substance of each of a series of steps will be recognized and the step transaction doctrine will not apply, if each such step demonstrates independent economic significance, is not subject to attack as a sham, and was undertaken for valid business purposes and not mere avoidance of taxes." *Commissioner of Revenue* v. *Dupee*, *supra*, quoting Rev. Rul. 79-250, 1979-2 C.B. 156.

There was ample evidence to support the board's findings. JCL's initial modification called for Talbots to sell its intangibles directly to Jusco (Europe). After General Mills expressed concern about the Massachusetts tax consequences, JCL proposed the two-step transaction that would satisfy the needs of both parties: Jusco (Europe) would acquire the Talbots intangibles, and General Mills would not have to pay a Massachusetts tax. The intermediate transaction served no legitimate business purpose and was designed solely to avoid a Massachusetts tax. It is immaterial that the end result may have been for legitimate business purposes. If an intermediate step has no legitimate business purpose beyond tax avoidance, it may be collapsed for tax purposes under the step transaction doctrine. Tal HC was merely a conduit through which the legitimate transactional route passed, and its involvement was

properly compressed into a single sale of the Talbots intangibles directly to Jusco (Europe).

General Mills and Talbots contend that Tal HC was not just a paper entity with no employees or offices. There was evidence, however, that such was the case, and that the original plan was to liquidate Tal HC shortly after it sold the intangibles. The finding of the board on this point is thus final, and one that we cannot disturb. But even if Tal HC were a functioning business, the result would not change because the over-all nature of the intermediate step is what matters, not just the nature of the intermediary, although that may be relevant, as here. Application of the step transaction doctrine is not limited to paper entities, and General Mills and Talbots cite no authority to the contrary. It is significant that the licensing agreement between Talbots and Tal HC did not require Talbots to make any royalty payments, but that the licensing agreement between Talbots and Jusco (Europe) did. This is persuasive evidence that Tal HC had no legitimate role in the sale other than tax avoidance.

General Mills and Talbots also argue that if the sale of Talbots's intangibles is to be compressed by application of the step transaction doctrine, then the entire plan must be reduced to a single transaction for the sale of the Talbots stock.[12] They ignore the fact that the parties structured their agreement as two separate transactions. If we were to grant the relief that General Mills and Talbots seek, we would be changing the basic nature of that agreement. JCL did not agree to a simple sale of stock; it agreed to buy assets. The parties agreed to two separate transactions: one for the sale of stock (subject to an election under § 338[h][10]), and one for the sale of intangibles. And so it was that two separate transactions involving four distinct corporations were presented to the Federal government for taxation: one, a deemed sale of assets by Talbots to Jusco (U.S.A.); the other, a sale of intangibles by Tal HC to Jusco (Europe). It is significant that Talbots and Tal HC paid Federal taxes on a total reported gain of $425 million from the two transactions, and JCL received a stepped up basis of $425 million in the assets it acquired. See I.R.C. § 338(h)(10); Letter Ruling 84-45, 3

[12]The commissioner argues that this issue was not raised below, but we are satisfied that it was. See note 8, *supra*.

Official MassTax Guide at 816-817 (West 2003) (Massachusetts affords stepped-up basis from election under I.R.C. § 338[h][10]). The step transaction doctrine was correctly applied to straighten the circuitous route taken in the second transaction, allowing the Commonwealth to assess a tax on the true nature of that transaction, namely, a sale of intangibles by Talbots to Jusco (Europe), while leaving the over-all agreement intact.

5. *Tax on sale of intangibles.* Under Massachusetts law, a corporation's taxable net income is multiplied by a three-factor apportionment formula to determine the percentage of the income that is taxable in Massachusetts. See G. L. c. 63, § 38 (*c*) (taxable net income apportioned to Commonwealth by multiplying such income "by a fraction, the numerator of which is the property factor plus the payroll factor plus twice times the sales factor, and the denominator of which is four"). See *Gillette Co.* v. *Commissioner of Revenue,* 425 Mass. 670, 673 (1997). The board determined that the commissioner properly included the receipts from Talbots's sale of its intangibles in the numerator of Talbots's sales factor, which is determined pursuant to G. L. c. 63, § 38 (*f*).[13] As part of that determination the board concluded that, pursuant to § 38 (*f*) (2), "a greater portion of the intangibles' income-producing activity was performed in the Commonwealth than in any other [S]tate, based on cost of performance." The board based its conclusion on findings that it was the business operations (including billing and customer relations) and management of Talbots, all of which were located in Massachusetts, that produced most of the value of the intangibles. The board also noted that all orders for goods were

[13]General Laws c. 63, § 38 (*f*), states: "The sales factor is a fraction, the numerator of which is the total sales of the corporation in this commonwealth during the taxable year, and the denominator of which is the total sales of the corporation everywhere during the taxable year. As used in this subsection, 'sales' means all gross receipts of the corporation except interest, dividends, and gross receipts from the maturity, redemption, sale, exchange or other disposition of securities. . . . Sales [of intangible] personal property, are in this commonwealth if: . . . 2. the income-producing activity is performed both in and outside this commonwealth and a greater proportion of this income-producing activity is performed in this commonwealth than in any other state, based on costs of performance."

sent to and filled from Talbots's distribution centers, all of which were located in Massachusetts.

General Mills and Talbots first argue that the board's recent decision in Combustion Eng'g, Inc. *vs.* Commissioner of Revenue, Appellate Tax Board No. F228740 (2000), requires that the sale of intangibles be excluded from the numerator of Talbots's sales factor. The Combustion Engineering case has no relevance to the issue at hand. In that case the board ruled that the proceeds from a deemed sale of assets following an election under I.R.C. § 338(h)(10) could not be included in the sales factor because the sales in question actually were a sale of stock, the proceeds of which are specifically excluded from the sales factor pursuant to G. L. c. 63, § 38 (*f*). Here, the sale did not involve a sale of stock, but a sale of Talbots's trademarks and trade names, which are not excluded from the sales factor.

There is no merit to the argument that all the income-producing activity occurred outside Massachusetts, either in Virginia, where a major portion of Talbots's catalogs were printed, or in New York and Minnesota, where the sale was negotiated. Such reasoning trivializes the years of work and business effort that developed the value of Talbots's intangibles, and the argument ignores the undisputed evidence, which the board accepted, that at each step of the catalog development process it was Talbots's management and employees, located in Massachusetts, who were responsible for the decision-making in preparing and finalizing the catalog and contributed most to the value of the intangibles. The board properly rejected the argument.

Finally, General Mills and Talbots argue that the effect of placing the receipts from the sale of intangibles in the numerator of Talbots's sales factor together with only one month of regular sales from the relevant fiscal year grossly distorted its actual business activity in Massachusetts and thereby resulted in an extraterritorial tax in violation of the due process and commerce clauses. In order to prevail on their constitutional challenge they have the "distinct burden of showing by 'clear and cogent evidence' that [the State tax] results in extraterritorial values being taxed." *Container Corp. of Am.* v. *Franchise Tax Bd.*, 463 U.S. 159, 164 (1983), quoting *Exxon Corp.* v. *Depart-*

*ment of Revenue of Wis.*, 447 U.S. 207, 223 (1980). It is uncertain how inclusion of the receipts from the sale of the intangibles would result in an extraterritorial tax. The Commonwealth's apportionment formula need only produce "a 'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State.' " *Id.* at 223, quoting *Moorman Mfg. Co.* v. *Bair*, 437 U.S. 267, 273 (1978). The argument is speculative, and must be rejected. See *Becton, Dickinson & Co.* v. *Department of Revenue*, 383 Mass. 786, 770 (1981).

The decision of the Appellate Tax Board is affirmed.

*So ordered.*