## Syms Corp. *vs.* Commissioner of Revenue.

Suffolk. September 10, 2001. - April 10, 2002.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Taxation,* Corporate excise; Appellate Tax Board: findings. *Administrative Law,* Substantial evidence. *Constitutional Law,* Taxation.

Substantial evidence supported a determination of the Appellate Tax Board that the Commissioner of Revenue had properly disallowed deductions taken by a corporate taxpayer for royalty payments it had made to a wholly owned subsidiary for the use of certain trade names, trademarks, and service marks that the taxpayer had transferred to the subsidiary on the grounds that the transfer and leaseback of the marks was a sham that could be disregarded under the "sham transaction doctrine" [509-513], and that the royalty payments were not deductible as ordinary and necessary business expenses, but were created solely for the purpose of effectuating a camouflaged assignment of income [513-514].

There was no merit to a corporate taxpayer's arguments that the due process and commerce clauses of the United States Constitution were violated by the Commissioner of Revenue's disallowing deductions taken by the taxpayer for royalty payments it had made to a wholly owned subsidiary for the use of certain trade names, trademarks, and service marks that the taxpayer had transferred to the subsidiary [514], or that its royalty deduction was disallowed pursuant to an across-the-board policy for the arbitrary, automatic, disallowance of deductions for all related trademark protection companies, allegedly adopted by the commissioner [514-515].

The Appellate Tax Board acted within its discretion in refusing to abate penalties levied on a corporate taxpayer that had not relied on the advice of a competent tax professional and had understood the risks inherent in a plan it used to reduce its taxes, such that its failure timely to pay certain corporate excise deficiencies resulting from the disallowance of its tax reduction plan was not due to reasonable cause. [515-516]

Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul H. Frankel,* of New York, for the taxpayer.

*Edward J. DeAngelo,* Special Assistant Attorney General, for Commissioner of Revenue.

CORDY, J. Syms Corp. (Syms) appeals from a decision of the Appellate Tax Board (board) affirming the refusal by the Commissioner of Revenue (commissioner) to abate $291,571 in corporate excise taxes assessed against it for the tax years 1986, 1987, 1989, 1990, and 1991. The assessments resulted from the commissioner's disallowance of deductions Syms had taken for royalty payments it had made to its wholly owned subsidiary, SYL, Inc. (SYL). The royalties were paid to SYL for the use of certain trade names, trademarks, and service marks (marks), which Syms had transferred to SYL in December, 1986.

After an evidentiary hearing, the board found that Syms had not sustained its burden of establishing its entitlement to an abatement, and that the commissioner had properly disallowed the deductions on three alternative grounds: (1) the transfer and leaseback of the marks was a sham and could be disregarded under the "sham transaction doctrine"[1]; (2) the royalty payments were not deductible as ordinary and necessary business expenses where there was no valid business purpose justifying the expense and SYL added little or no value to the marks; and (3) G. L. c. 63, § 39A, permitted the commissioner to eliminate the royalty payments from the calculation of net income because they were made between affiliated corporations and were in excess of fair value.

On appeal, Syms claims that the board's findings are not supported by the record, that G. L. c. 63, § 39A, only permits the elimination of payments between subsidiaries and not from a parent corporation to its subsidiary, and that the disallowance of the deductions violates the due process and commerce clauses of the United States Constitution. Syms also challenges the board's refusal to abate the penalties assessed against it by the commissioner. We conclude that the board's findings are supported by substantial evidence in the record and that the disallowances do not violate the United States Constitution. We need not and therefore do not reach the question of the applicability of G. L. c. 63, § 39A, to the payments in this case.

1. *Background.* Syms is a New Jersey corporation engaged in

---

[1] A "sham transaction" in this context means a transaction that in fact occurred in an effort to exploit a feature of the tax laws, not a transaction that did not occur, or did not occur as reported.

"off-price" retailing, which is the retail sale of brand name clothing at prices lower than those in department stores. It was founded in 1959 by Sy Syms. It operates two stores in the Commonwealth and therefore is subject to Massachusetts corporate excise tax.

During the years in question, Sy Syms was the chairman of the board of directors and the dominant shareholder, owning fifty-six per cent of the stock and controlling the votes for another twenty-four per cent held in trust for family members. His daughter, Marcy Syms, was the president of the company.

Syms used several marks in its business, including the "Syms" name, a "multiple 'S' logo" that it placed on its own brands of clothing, and the slogan, "An Educated Consumer is Our Best Customer." Prior to December, 1986, Syms owned these marks.

The idea of a trademark holding subsidiary was first brought to the attention of Syms in early 1986 by Irv Yacht, a consultant with a company called Coventry Financial Corporation. Yacht broached this idea in a letter to Syms's chief financial officer, Richard Diamond, in which he promised that he "had a method of saving state taxes." Immediately after their first meeting in the spring of 1986, Yacht and Diamond signed an agreement, which recited that Coventry "has developed a program . . . for reducing [Syms's] income taxes by reorganizing the business activities of [Syms] in certain areas." Yacht's proposal was for Syms to form a Delaware subsidiary, transfer the marks to that subsidiary, and then execute a license agreement under which Syms would continue to use the marks as it had before the transfer (Coventry plan).

Under the license agreement, Syms would pay a large royalty to the subsidiary, thereby generating a deduction for Syms on its State excise taxes.[2] The subsidiary, however, would not pay any State tax on the royalty income because, under Delaware law, corporations that hold intangible assets are exempt from income tax. Syms was to pay Coventry twenty-five per cent of

---

[2]The tax scheme does not affect Federal taxation because, for Federal tax purposes, Syms and its subsidiaries filed a consolidated return. I.R.C. § 1501 (1994).

the tax savings realized in the first year, with a declining percentage for the next four years.

In considering whether to engage in the Coventry plan, Syms recognized the risk of a tax audit. In a memorandum to Sy Syms, Diamond wrote, "There have been cases when corporations attempted to do this and did not do it properly and thus had problems in various states. It is everyone[']s feeling that New York is the most sophisticated state in terms of tax audits and most other states will not even realize the impact of the transactions." As a precaution, Syms held part of Coventry's compensation in escrow in case the hoped-for tax savings were disallowed in an audit.

Syms also consulted its trademark attorneys about risks attendant to the transfer of the marks under trademark law,[3] and was advised that the transfer would be valid as a matter of trademark law because "Syms Corp. will own and control the subsidiary. Whether or not the subsidiary is an active entity, its assets (consisting of the trademarks) belong to the parent company. Syms Corp. will, in fact, continue to stand behind the goods and services identified by these marks."

Syms decided to proceed with the Coventry plan and SYL was incorporated in Delaware on December 4, 1986, as Syms's wholly owned trademark holding company. Its board of directors and officers were Sy Syms, Marcy Syms, Richard Diamond, and Edward Jones, a partner in a Delaware accounting firm.[4] SYL and Syms executed a license agreement on December 18, 1986. SYL, acting as the owner of the marks, granted to Syms the right to use the marks nationally for a royalty equal to four per cent of Syms's annual net sales. The marks were transferred from Syms to SYL the next day, December 19, 1986.

For the calendar year 1986, Syms paid SYL a royalty for the marks that constituted four per cent of its annual net sales from October 1, 1986, until the end of December. The 1986 royalty was approximately $2.8 million. In subsequent years, the royalty

[3] A transfer of a mark without the attendant good will is invalid under trademark law. 2 J.T. McCarthy, Trademarks and Unfair Competition § 18:2, at 18-7 (4th ed. 2001).

[4] The Syms board of directors at the time SYL was "incorporated" were Sy Syms, Marcy Syms, Richard Diamond, and three others.

amount increased from nearly $10 million in 1987 to $12.7 million in 1991. In each of these years SYL received one annual royalty payment from Syms, which it held in Delaware for a few weeks before paying it back to Syms, with interest (minus expenses) as a tax-free dividend.[5] SYL's only income came from Syms's annual royalty payments, and its expenses amounted to approximately one-tenth of one per cent of its income.

SYL's corporate "office" consisted of an address rented from Jones's Delaware accounting firm, for an annual fee of $1,200.[6] The accounting firm provided this same service to "a couple of hundred" other corporations that used Delaware subsidiary corporations to hold their intangible assets. Jones was not only a partner of the accounting firm, he was SYL's only employee, serving in a part-time capacity for which he was paid $1,200 per year.

The business operations of Syms did not change after the transfer and license-back of the marks. All of the work necessary to maintain and protect the marks continued to be done by the same New York City trademark law firm that had previously performed those services, and Syms (not SYL) continued to pay all the expenses attendant thereto. All efforts to maintain the good will and thus to preserve the value of the marks were undertaken by Syms, and all advertising using the marks was controlled and paid for by Syms or by a wholly owned Syms subsidiary formed solely to do advertising. The choice of which products would be sold under the marks, as well as the quality control of those products, remained the responsibility of the same persons who had done that work before the transfer — Sy Syms himself, and the Syms staff of buyers.

2. *Sham transaction.* Syms does not contest the validity of the "sham transaction doctrine" and the commissioner's authority under that doctrine to disregard, for taxing purposes, transactions that have no economic substance or business purpose

---

[5]Dividends paid among affiliated corporations are completely exempt from Federal taxes, I.R.C. § 243, 26 U.S.C.A. § 243 (West Supp. 2001), and ninety-five per cent exempt from State taxes, G. L. c. 63, § 38 (*a*) (1).

[6]SYL also paid a one-time fee of $1,000 for office equipment.

other than tax avoidance.[7] It is a doctrine long established in State and Federal tax jurisprudence dating back to the seminal case of *Gregory* v. *Helvering,* 293 U.S. 465 (1935). It works to prevent taxpayers from claiming the tax benefits of transactions that, although within the language of the tax code, are not the type of transactions the law intended to favor with the benefit. *Horn* v. *Commissioner of Internal Revenue,* 968 F.2d 1229, 1236-1237 (D.C. Cir. 1992). "Usually, transactions that are invalidated by the doctrine are those motivated by nothing other than the taxpayer's desire to secure the attached tax benefit," and are structured to completely avoid economic risk. *Id.* at 1236.[8]

Syms contends that the doctrine does not apply in this case because it had business purposes, other than tax avoidance, for incorporating SYL and then transferring to it and licensing back the marks which it previously owned. It complains that the board ignored the "uncontroverted" evidence of these other business purposes, and based its decision on the record in ·

---

[7]*ACM Partnership* v. *Commissioner of Internal Revenue,* 157 F.3d 231, 247 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999) (if transaction has no economic substance and no business purpose other than tax avoidance, it may be invalidated for tax purposes). See *Casebeer* v. *Commissioner of Internal Revenue,* 909 F.2d 1360, 1363 (9th Cir. 1990); *James* v. *Commissioner of Internal Revenue,* 899 F.2d 905, 908 (10th Cir. 1990); *Rice's Toyota World, Inc.* v. *Commissioner of Internal Revenue,* 752 F.2d 89, 94 (4th Cir. 1985).

[8]A tax avoidance motive is, of course, not necessarily fatal. A corporation created, or a transaction engaged in for the purpose of reducing taxes may not be disregarded so long as it has some economic substance or valid business purpose. See *Moline Props., Inc.* v. *Commissioner of Internal Revenue,* 319 U.S. 436, 438-439 (1943) (corporation recognized as separate entity for tax purposes "so long as [its] purpose is the equivalent of business activity"); *Northern Ind. Pub. Serv. Co.* v. *Commissioner of Internal Revenue,* 115 F.3d 506, 514 (7th Cir. 1997) (subsidiary had economic substance because it earned profit from its activities); *Eli Lilly & Co.* v. *Commissioner of Internal Revenue,* 856 F.2d 855, 863-866 (7th Cir. 1988) (transfer of patents to subsidiary engaged in manufacturing not motivated solely by tax considerations); *Commissioner of Revenue* v. *Dupee,* 423 Mass. 617, 624 (1996) (transfer of assets to new partnership had economic significance and valid business purpose); *Koch* v. *Commissioner of Revenue,* 416 Mass. 540, 554-557 (1993) (assignment of stock served business objective other than tax avoidance).

another case litigated shortly after this one,[9] and on an across-the-board policy of the "disallowance of deductions for all related trademark protection companies."

The question whether or not a transaction is a sham for purposes of the application of the doctrine is, of necessity, primarily a factual one,[10] on which the taxpayer bears the burden of proof in the abatement process. *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 556 (1993).

The board's decision is final as to findings of fact. G. L. c. 58A, § 13. See *Commissioner of Corps. & Taxation* v. *J.G. McCrory Co.*, 280 Mass. 273, 278 (1932). This means that the board's "findings have the same force and effect as the verdict of a jury or the finding of a judge sitting without a jury in an action at law or the finding of a judge or master in equity upon unreported evidence." *Id.* Accordingly, our review of the board's factual findings is limited to whether, as a matter of law, the evidence is sufficient to support them. *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 240 (1998). "Our review of the sufficiency of the evidence is limited to 'whether a contrary conclusion is not merely a possible but a necessary inference from the findings.' " *Id.*, quoting *Kennametal, Inc.* v. *Commissioner of Revenue*, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998). If supported by sufficient evidence, we will not reverse a decision of the board unless it is based on an incorrect application of the law. See *Koch* v. *Commissioner of Revenue*, *supra* at 555.

The board found that the transfer and license back transaction had no practical economic effect on Syms other than the creation of tax benefits, and that tax avoidance was the clear motivating

[9]Sherwin-Williams Co. *vs.* Commissioner of Revenue, Appellate Tax Board No. F233560 (SJC-08516).

[10]See *Commissioner of Internal Revenue* v. *Pope*, 239 F.2d 881, 883 (1st Cir. 1957). See also *ACM Partnership* v. *Commissioner of Internal Revenue*, *supra* at 245; *Lee* v. *Commissioner of Internal Revenue*, 155 F.3d 584, 586 (2d Cir. 1998); *Rink* v. *Commissioner of Internal Revenue*, 47 F.3d 168, 172 (6th Cir. 1995); *Casebeer* v. *Commissioner of Internal Revenue*, *supra* at 1363; *Kirchman* v. *Commissioner of Internal Revenue*, 862 F.2d 1486, 1490 (11th Cir. 1989); *Comdisco, Inc.* v. *United States*, 756 F.2d 569, 575 (7th Cir. 1985); *Rice's Toyota World, Inc.* v. *Commissioner of Internal Revenue*, *supra* at 92.

factor and its only business purpose.[11] See *Casebeer* v. *Commissioner of Internal Revenue*, 909 F.2d 1360, 1365 (9th Cir. 1990) (taxpayer must show both that transaction was supported by business purpose other than tax avoidance and had economic substance other than creation of tax benefit); *James* v. *Commissioner of Internal Revenue*, 899 F.2d 905, 908-909 (10th Cir. 1990) (consideration of business purpose and economic substance are factors in determining whether transaction had any practical effect other than creation of income tax losses). The board rejected the other business purposes claimed by Syms during the hearing, finding them to be "illusory, not supported by the evidence, or contrary to the weight of the evidence."[12]

Our review of the record of the proceedings before the board confirms that it rejected the purported business purposes not by ignoring "strong, uncontested, evidence" of their existence, but after carefully examining and weighing the evidence proffered as to each of them. Its detailed findings on these matters are supported by substantial evidence, and Syms's allegation that the board's decision was based on the record of another case is without foundation. While there may be many important business purposes attendant to the transfer and licensing back of intangible assets within corporate families, to be viable for the

[11]The board appropriately looked beyond the issue whether SYL was a' validly constituted separate corporate entity and focused on whether the transfer and license-back transaction was a sham.

[12]Syms proffered, and the board rejected, almost a dozen nontax business purposes to support its claim that the transfer and license-back was not intended solely to avoid taxation. For example: Syms's assertion that the transfer would protect the marks from claims of Syms's creditors was rejected by the board, because creditors could reach assets of Syms's wholly owned subsidiary; Syms's claim that the transfer would protect the marks from a hostile takeover was rejected, because Syms could only have achieved that goal by transferring the marks to an independent third party, and with eighty per cent of the stock controlled by the company founder, such a takeover was hypothetical at best; Syms's claim that the transfer would result in better management of the marks was rejected because Syms retained the same responsibilities for managing and maintaining the marks after the transfer; and Syms's assertion that the formation of the subsidiary would enhance Syms's ability to borrow funds was rejected because creditors would have viewed the two entities as intermingled and would not have offered any different financing arrangements, Syms's founder strenuously opposed borrowing money, and the subsidiary never borrowed any money.

purposes claimed by Syms, they must be more than theoretical musings, concocted to provide faint cover for the creation of a tax deduction.

3. *Ordinary and necessary expense.* General Laws c. 63, § 1 ("[n]et income"), provides that corporations may take business deductions allowable under the Internal Revenue Code (Code). Under the Code, only "ordinary and necessary" business expense deductions are allowable. I.R.C. § 162. Deductions are not permitted if the expense was "created solely for the purpose of effectuating a camouflaged assignment of income." *United States* v. *Estate Preservation Servs.*, 202 F.3d 1093, 1101 (9th Cir. 2000), quoting *Audano* v. *United States*, 428 F.2d 251, 256-257 (5th Cir. 1970). As an alternative ground for the disallowance of Syms's deduction for royalty expense, the board concurred with the commissioner's position that the royalty payments were not an "ordinary and necessary" business expense.

The board found that the value of the marks had been created entirely by Syms, and, even after their transfer and the payment of the royalties, Syms continued to pay the expenses associated with owning them, including the legal expenses incurred in maintaining them. It concluded that, in such circumstances, Syms's royalty payments to SYL for the use of the marks was unnecessary. In effect, Syms was paying twice for their use. The board further reasoned that it was irrelevant that the measure of royalty payments might have been equivalent to what would have been paid in an arm's-length transaction[13] where, as here, the payments were not for services provided by SYL but rather part of a contrived mechanism by which affiliated entities shifted income, tax free, between themselves in a circular transaction for the benefit of Syms.

Syms counters that, having validly transferred the trademarks to SYL in consideration for receipt of SYL stock, it was required to pay royalty fees, and, therefore, they were a necessary business expense. It also argues that there is no requirement that owners add value to assets before allowing their use by another

---

[13]Syms offered in evidence a valuation study prepared after the four per cent royalty rate was set to establish that the rate was comparable to one which might have been negotiated in an arm's-length transaction.

entity, and that the sole test whether the royalty payments are deductible is whether they were made at "arm's length."

These arguments closely mirror those made on the question whether the transfer and license back of the marks constituted a "sham" transaction. The central issue for the court to decide is whether the board's finding that there was no business reason for Syms to incur the expense of millions of dollars in royalties other than to create tax deductions is supported by the record. As we have already concluded, it is. The royalty expense to Syms "resulted not as an ordinary, necessary incident in the conduct of the taxpayer's business, but instead was created solely for the purpose of effectuating a camouflaged assignment of income." *United States* v. *Estate Preservation Servs., supra* at 1101, quoting *Audano* v. *United States, supra.*[14] It was properly disallowed.

4. *Due process and commerce clause.* Syms's perfunctory constitutional argument does nothing but restate its earlier arguments under a new label. Because Syms had two stores in Massachusetts, the minimal constitutional "nexus" requirement was met. *Becton, Dickinson & Co.* v. *Department of Revenue*, 383 Mass. 786, 788 (1981). Hence, the only question for the board to decide was whether Syms could reduce its taxable income by deducting the royalties. By disallowing those deductions, the board did not apply a "unitary" theory of taxation to reach the non-Massachusetts income. Rather, it simply rejected "a deduction which is not justifiable under the facts of a particular transaction." *Id.* It based this conclusion on evidence received at a fair hearing. Syms's disappointment that the board did not find the facts the way it would have liked does not rise to a constitutional question.

5. *The commissioner's policy.* Finally, Syms claims that its

---

[14]The fact that payment of the royalties was the result of a contractual obligation between Syms and SYL does not, standing alone, render it an ordinary business expense. *Interstate Transit Lines* v. *Commissioner of Internal Revenue*, 130 F.2d 136, 139 (8th Cir. 1942), aff'd, 319 U.S. 590 (1943), citing *Deputy* v. *duPont*, 308 U.S. 488 (1940). The payment must be, in the business context in which it arose, a "common" or "accepted" method to achieve a business objective in the circumstances. See *Welch* v. *Helvering*, 290 U.S. 111, 114 (1933). The board's conclusion that the payments here failed this test is fully supported in the record.

royalty deduction was disallowed pursuant to "an across-the-board policy for the arbitrary, automatic, disallowance of deductions for all related trademark protection companies," allegedly adopted by the commissioner. It points to no evidence of such a policy. Without a factual basis on which to support its claim that such a policy exists, the claim fails of its own weight.

6. *Penalties.* The board acted within its discretion in refusing to abate penalties levied on Syms. General Laws c. 62C, § 33 (*f*), provides for an abatement of penalties "[i]f it is shown that any failure to file a return or to pay a tax in a timely manner is due to reasonable cause and not due to willful neglect." See *Commissioner of Revenue* v. *Wells Yachts South, Inc.,* 406 Mass. 661, 665 (1990) (reasonable cause, in this context, means that taxpayer must show exercise of degree of care of ordinary taxpayer in same position). A taxpayer exercises reasonable care when "he selects a competent tax expert to provide an opinion on a tax matter . . . and then relies on his opinion with respect to the tax matter in question." *Samia* v. *Commissioner of Revenue,* 15 Mass. App. Tax Bd. Rep. 73, 78 (1993), citing *Rohrabaugh* v. *United States,* 611 F.2d 211 (7th Cir. 1979). See *M & T Charters, Inc.* v. *Commissioner of Revenue,* 404 Mass. 137, 144 (1989) (fact finder may consider whether "taxpayer's reliance on professional advice was reasonable"). The taxpayer has the burden of establishing a right to an abatement. *Blakeley* v. *Commissioner of Revenue,* 28 Mass. App. Ct. 499, 501 (1990), citing *M & T Charters, Inc.* v. *Commissioner of Revenue, supra.*

Here, the board found that the plan was not drafted or reviewed by a competent tax professional on behalf of Syms. An internal company memorandum submitted by Syms indicated that the plan had been "looked at" by "Mann Judd Landau," who believed that it was "within the state tax laws," but that "[t]hey can not give an opinion as to what might occur during a tax audit." On this record, the board was within its discretion to conclude that the taxpayer had not relied on the advice of a competent tax professional, had understood the risks inherent in the tax plan, and, therefore, its failure timely to pay the corporate excise deficiencies resulting from the disallow-

ance of its royalty payment deductions was not due to reasonable cause.

*Decision of the Appellate Tax Board affirmed.*