KIMBERLY-CLARK CORPORATION & another[1] *vs.*
COMMISSIONER OF REVENUE.

No. 11-P-632.

Suffolk. January 6, 2012. - January 11, 2013.

Present: KANTROWITZ, TRAINOR, & HANLON, JJ.

*Taxation,* Corporate excise, Excise.

Discussion of the standard of review applicable to an appeal from a decision of the Appellate Tax Board. [72-73]

In an appeal from a determination of the Commissioner of Revenue denying the taxpayer's requests to abate corporate excise taxes, substantial evidence supported the Appellate Tax Board's decision to employ a "clear and convincing evidence" standard, and the decision represented a correct application of the law. [73-76]

In an appeal from a determination of the Commissioner of Revenue (commissioner) denying the taxpayer's requests to abate corporate excise taxes, substantial evidence supported the conclusions of the Appellate Tax Board (board) that the commissioner properly added back interest expense deductions related to the taxpayer's cash-management system and that the nature of the transactions within the cash-management system did not change during the years in question [76-77]; further, the board properly concluded that certain royalty payments had the requisite level of economic substance and business purpose [77-80]; finally, substantial evidence supported the board's finding that certain rebate payments were in fact embedded royalties [80-81].

APPEAL from a decision of the Appellate Tax Board.

*Philip S. Olsen (Natasha Varyani* with him) for the taxpayer.

*David A. Guberman,* Special Assistant Attorney General, for Commissioner of Revenue.

TRAINOR, J. Kimberly-Clark Corporation (Kimberly-Clark) and Kimberly-Clark Global Sales, Inc. (Global), a wholly-owned subsidiary of Kimberly-Clark (collectively, taxpayer),[2] appeal

---

[1]Kimberly-Clark Global Sales, Inc.

[2]Kimberly-Clark and Global are both Delaware corporations.

from a decision of the Appellate Tax Board (board) affirming the denial by the Commissioner of Revenue (commissioner) of the taxpayer's requests to abate corporate excise taxes in 2001, 2002, and 2003.[3] The three appeals were consolidated and heard together in October and November, 2009. In July, 2010, the board ruled in favor of the commissioner. Specifically, the board affirmed the denial of Kimberly-Clark's requested abatement of $1,514,355 for the tax years ending December 31, 2001 and 2002, and Global's requested abatement of $1,113,418 for the tax year ending December 31, 2003.

*Conclusions of the board.* For the tax year ending December 31, 2001, the board concluded that the commissioner had properly disallowed interest expenses claimed by Kimberly-Clark on transfers made between related entities by way of the taxpayer's cash-management system. The board therefore affirmed the commissioner's assessment of corporate excise against Kimberly-Clark in the total amount of $817,797.25.

For the tax year ending December 31, 2002, the board concluded that the commissioner had properly disallowed (1) interest expenses claimed by Kimberly-Clark on transfers made between related entities through the taxpayer's cash-management system, and (2) patent royalties Kimberly-Clark had paid to Kimberly-Clark Worldwide, Inc. (Worldwide), a related entity. The board therefore affirmed the commissioner's assessment of corporate excise against Kimberly-Clark in the total amount of $1,089,700.

For the tax year ending December 31, 2003, the board concluded that the commissioner had properly disallowed (1) interest expenses claimed by Global related to its participation in the cash-management system, and (2) payments among related entities that the taxpayer referred to as "rebate payments." The board therefore affirmed the commissioner's assessment of additional corporate excise against Global in the total amount of $1,113,418.

The taxpayer appeals from the decision of the board, arguing that (1) Kimberly-Clark was entitled to interest expense deductions because the cash-management system created real debt between the parties; (2) Kimberly-Clark was entitled to the

---

[3]The taxpayer appealed from the commissioner's decision pursuant to G. L. c. 58A, § 7, and G. L. c. 62C, § 39.

royalty deductions because the transactions and entities at issue had both business purpose and economic substance; (3) the 2003 rebate payments were improperly characterized by the board as royalty payments and, therefore, should not have been added back by the commissioner; and (4) the board erroneously applied a clear and convincing evidence standard to the hearings before the board, when the actual standard was a preponderance of the evidence.

We conclude that the taxpayer's arguments are without merit, and affirm.

*Background.* For the facts, we refer to the board's January 31, 2011, detailed findings of fact and report, and repeat only those facts most relevant to our decision on appeal.

Kimberly-Clark began doing business in the 1870s and has since grown into a leading manufacturer of toiletries and paper and tissue products, among other items. In the mid-1990s, Kimberly-Clark entered into an agreement and plan of merger (the merger) with the Scott Paper Company (Scott), whereby Kimberly-Clark acquired all of the outstanding shares of Scott, which became a wholly owned subsidiary of Kimberly-Clark.[4]

1. *Cash-management system.* For each of the tax years at issue the taxpayer utilized a centralized cash-management system, through which all the cash receipts of each of Kimberly-Clark's subsidiaries were deposited into a lock box maintained by Kimberly Clark Financial Services, Inc. (Financial). The cash was "swept up" daily to Kimberly-Clark and placed in a single pool, from which the expenses of the various subsidiaries were paid. Kimberly-Clark recorded each instalment of cash it received from the lock box at Financial as a payable, with interest calculated monthly. The record contains no evidence indicating that any subsidiary received any return of its advances to Kimberly-Clark in excess of the amount required to pay the subsidiaries' expenses. At the end of each of the tax years at issue, 2001, 2002, and 2003, Kimberly-Clark was a self-described net borrower.

On December 31, 1998, Kimberly-Clark and Worldwide

---

[4]After the merger, Scott's name was changed to Kimberly-Clark Tissue Company. To avoid confusion between Kimberly-Clark and Kimberly-Clark Tissue Company, in this opinion we refer to the subsumed company as Scott.

executed an "Amended and Restated Loan Agreement" that stated
the parties' intention and agreement to make loans to each other
on an ongoing basis. Also in evidence were promissory notes
payable from Kimberly-Clark to Worldwide on December 31,
2003, and December 31, 2008. Neither the loan agreement nor
any of the promissory notes in evidence contained "collateral" or
"default" provisions, or any similar provisions describing what
should be done in the event that the debts between the entities
went unpaid. Regarding the interest rates charged to the subsidiar-
ies, a representative of Kimberly-Clark testified that for each
lending transaction the company charged "the rate that would be
published by the IRS as what is representative of an arm's-length
transactional rate as opposed to going into individual negotiations
. . . ." No evidence was offered that any of the notes were
repaid by Kimberly-Clark, or that any substantial requests for, or
efforts toward, repayment were made by either Kimberly-Clark
or its subsidiaries. Based on the evidence presented, the board af-
firmed the commissioner's disallowance of the interest expenses
related to the cash-management system, finding that the taxpayer
had not incurred true debt.

2. *Royalty expenses of 2002.* As a result of Kimberly-Clark's
acquisition in 1995 and liquidation in 2000 of Scott's outstand-
ing stock, Kimberly-Clark began to consolidate and centralize
several operational functions of the two large merging entities.
Paul McGuire, Kimberly-Clark's assistant controller for tax ac-
counting, testified that as a result of the merger the parent
companies needed to restructure in order to centralize owner-
ship and control of their intellectual property. As a result, in
November 1996, Kimberly-Clark and Scott transferred owner-
ship of their patents and the management of their trademarks to
Worldwide, a newly created subsidiary of Scott.[5,6,7] Worldwide

[5]Kimberly-Clark and Scott did not receive consideration from Worldwide for
the initial transfer of ownership of the patents and management of the trademarks.

[6]The board noted that the "sole signatory" to the eight agreements transfer-
ring the intangible assets from Kimberly-Clark to the subsidiary was John W.
Donehower, and that Donehower "executed the agreements in his capacity as
president of Worldwide and Senior Vice President and Chief Financial Officer
of Kimberly-Clark and [Scott]."

[7]Worldwide remained a wholly-owned subsidiary of Scott until 2000, when
Scott was liquidated into Kimberly-Clark.

granted licenses to the patents and sublicenses to the trademarks back to Kimberly-Clark and Scott. In consideration of these licenses and sublicenses, Kimberly-Clark agreed to pay a royalty to Worldwide of three percent of sales as defined in each agreement, and Scott agreed to pay Worldwide a royalty of 3.1 percent to 3.3 percent of sales, the rate changing depending on the time period specified.

The ostensible reasons for the restructuring are stated in a 1996 internal document entitled the "Project Partners Communication Guide" (guide), issued by Kimberly-Clark to "those teams affected by the creation of [Worldwide]." The guide states that the "change centralizes the ownership of intangible assets of three companies" and "will produce . . . significant tax savings."

Kimberly-Clark and Scott transferred full ownership of the patents to Worldwide, thus generating the substantial royalty payments that followed, but notably retained ownership of the trademarks. There was no explanation offered for the retention of the trademarks in the context of Kimberly-Clark's stated goals to increase efficiencies and enhance the protection of their intellectual property following the merger. The board found that this disparate treatment of the patents and trademarks undermined the taxpayer's assertion that tax reduction was not a principal purpose of the 1996 reorganization.

The board also found it significant that company tax personnel played a dominant role in the 1996 restructuring. The restructuring apparently did not include significant involvement by operations personnel, company managers, or employees responsible for evaluating intellectual property issues, despite the fact that the taxpayer claims such issues as the impetus behind the restructuring. The board also noted that the only witnesses presented by the taxpayer to support their claims on appeal were the company's director of tax defense, assistant controller for tax accounting, and controller.

The board concluded that the license agreements between Kimberly-Clark and its affiliated entities were de facto exclusive licenses, in that the record did not indicate that Worldwide or any other subsidiary entered into any third-party licensing agreements with respect to either the patents or the trademarks. The

board further found that the royalties paid by Kimberly-Clark and Scott to Worldwide effectively were immediately returned to Kimberly-Clark, by way of the cash-management system.

Based on the foregoing facts, the board found that the taxpayer failed to demonstrate that tax reduction was not a principal purpose of the 1996 restructuring, and that the taxpayer did not sustain its burden of demonstrating that the commissioner's "add back" of the royalty expenses for the tax year 2002 was unreasonable under G. L. c. 63, § 31I.

3. *Global's rebate payments of 2003.* As a part of Kimberly-Clark's efforts to centralize and increase efficiencies, in 2002 it created Global to serve as the entity that controlled the conglomerate's entire supply-chain management process. Manufacturing was done primarily by Kimberly-Clark, but also through contracts with other entities that were qualified by Worldwide as "certified suppliers."

Prior to the 2003 centralization, Kimberly-Clark and the other certified suppliers had paid Worldwide many millions of dollars per year in patent royalties. After the centralization, Worldwide received only a small fraction of the royalty payments it had previously received, in the form of an annual payment from Global for approximately $1 million. It received nothing explicitly characterized as a "royalty" from Kimberly-Clark or the other certified suppliers. However, the money Worldwide received in return for the use of the patents was not limited to its comparatively small royalty payment from Global. In 2002, a rebate program was implemented by which Kimberly-Clark and other certified suppliers would pay Global the amount of cost savings realized from use of the patents. Global would then "rebate" that money to Worldwide, and Global subsequently deducted the amounts for its 2003 tax year.

The board found that the rebate payments effectively constituted payment for the use of the patents and, thus, were in fact embedded royalties. Although the taxpayer argued that the rebate payments in fact represented compensation paid to Worldwide for its assumption of business risk, the board found that this assertion lacked credibility. The board found that the add-back provisions of G. L. c. 63, § 31I, properly applied to the rebate

payments, and that the commissioner's add back of the sums associated with the rebate program was warranted.

4. *The* Sherwin-Williams *case and the "sham transaction" doctrine.* In 2002, the Supreme Judicial Court considered the tax implications of the transfer and subsequent licensing-back of trademarks and patents between a parent company and its wholly-owned subsidiaries. *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. 71 (2002) (*Sherwin-Williams*). In evaluating the board's disallowance of deductions based on these transactions, the court applied the "sham transaction doctrine," which "gives the commissioner the authority 'to disregard, for taxing purposes, transactions that have no economic substance or business purpose other than tax avoidance.' " *Id.* at 79-80, quoting from *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. 505, 509-510 (2002). See *IDC Research, Inc.* v. *Commissioner of Rev.*, 78 Mass. App. Ct. 352, 353 (2010). In *Sherwin-Williams*, *supra* at 85-86, the court ultimately found that the transactions did have economic substance and that the commissioner's adjustments were unreasonable. The court's conclusion was based on several factors, including an absence of a circular flow of funds between the companies and the fact that the subsidiaries to which the trademarks had been transferred "entered into genuine obligations with unrelated third parties for use of the [trademarks and patents]." *Id.* at 86. In *Sherwin-Williams*, proof of economic substance and the existence of some business purpose was sufficient to prove that the commissioner's adjustments were unreasonable, regardless of the fact that tax avoidance might have been a motivation of the transaction in question. *Id.* at 86-90.

5. *The enactment of the Add Back Statutes.* In 2003, approximately four months after the decision was issued in *Sherwin-Williams*, the Legislature enacted G. L. c. 63, §§ 31I and 31J (collectively, the Add Back Statutes), inserted by St. 2003, c. 4, § 17. With the exception of the 2001 interest expenses related to Kimberly-Clark's cash-management system, the disposition of the contested issues in these appeals is dependent on an application of the Add Back Statutes.[8] This is the first

---

[8]The Add Back Statutes were passed as an emergency act during 2003, and are effective for tax years beginning on or after January 1, 2002. See St. 2003, c. 4, § 87.

time a Massachusetts appellate court has considered an appeal relating to the type of related entity expense deductions governed by the Add Back Statutes.

The Add Back Statutes effectively made it more difficult for a corporate taxpayer to deduct expenses or costs paid to a related entity. Such deductions were now presumptively disallowed, and would be "add[ed] back" to the taxpayer's net income unless "(A) the taxpayer establishes by clear and convincing evidence, as determined by the commissioner, that the adjustments are unreasonable; or (B) the taxpayer and the commissioner agree in writing to the application or use of an alternative method of apportionment under [§] 42." G. L. c. 63, § 31I(*c*)(i). The commissioner has promulgated regulations that provide substantive guidance for determining when such adjustments are in fact unreasonable: "The add back will . . . be considered unreasonable where the taxpayer establishes by clear and convincing evidence that it incurred the interest or intangible expense as a result of a transaction [1] that was primarily entered into for a valid business purpose and [2] that is supported by economic substance. However, a taxpayer will not carry its burden of demonstrating by clear and convincing evidence that a disallowance is unreasonable unless the taxpayer demonstrates that reduction of tax was not a principal purpose for the transaction." 830 Code Mass. Regs. § 63.31.1(4)(a)1.b (2006). See G. L. c. 63, § 31I(*c*)(ii)(B). In other words, the commissioner would find a presumptively required add back unreasonable only where the transaction was primarily for a valid business purpose and had economic substance and tax reduction was not a principal purpose.

*Discussion.* 1. *Standard of review of the board's decision.* The board is an independent administrative tribunal with the power to decide tax appeals brought in accordance with G. L. c. 62C, § 39. See G. L. c. 58A, §§ 1, 6. "A decision of the board will not be reversed or modified if it is based on substantial evidence and on a correct application of the law." *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993). See *Commissioner of Rev.* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43 (1996) (when reviewing a decision of the board, "the sole question before us is whether the board erred as a matter of law"). We must determine whether the board "appl[ied] the proper legal

standards to the evidence" and whether the "subsidiary findings . . . support the board's ultimate finding[s]." *Sherwin-Williams*, 438 Mass. at 86, 87. "[B]ecause the board is an agency charged with administering the tax law and has 'expertise in tax matters,' . . . we give weight to its interpretation of tax statutes, . . . and will affirm its statutory interpretation if [it] is reasonable." *MASSPCSCO* v. *Assessors of Woburn*, 80 Mass. App. Ct. 398, 402 (2011), quoting from *AA Transp. Co.* v. *Commissioner of Rev.*, 454 Mass. 114, 119 (2009). "Our review of the sufficiency of the evidence is limited to 'whether a contrary conclusion is not merely a possible but a necessary inference from the findings.' " *IDC Research, Inc.* v. *Commissioner of Rev.*, 78 Mass. App. Ct. at 353, quoting from *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 511.

2. *Burden of proof issue.* There is disagreement between the parties on the burden of proof the taxpayer was required to meet when appealing the decisions of the commissioner to the board.[9] The taxpayer argues that the board erroneously applied a clear and convincing evidence standard where it should have used a preponderance of the evidence standard.[10]

The commissioner maintains that the passage of the Add Back Statutes changed the standard to a clear and convincing evidence standard for the entire appeals process. The relevant section of the Add Back Statutes provides that a deduction of interest or expenses paid to a related member will only be allowed if "the taxpayer establishes by clear and convincing

---

[9]The burden of proof issue does not affect our consideration of the 2001 interest deductions relating to the cash-management system. As noted in note 8, *supra*, the clear and convincing standard required by the Add Back Statutes is only effective for tax years beginning on or after January 1, 2002. See St. 2003, c. 4, § 87.

[10]Title 831 Code Mass. Regs. § 1.37 (1996) states that "practice and procedure before the Board shall conform to that heretofore prevailing in equity causes in the courts of the Commonwealth prior to the adoption of the Massachusetts Rules of Civil Procedure . . . ." (The current regulations contain the same provision. See 831 Code Mass. Regs. § 1.37 [2007].) The standard rule in such equity cases was that the party bearing the burden of proof was required to meet its burden by a preponderance of the evidence. See *Black* v. *Boston Consol. Gas Co.*, 325 Mass. 505, 508 (1950); *Sullivan* v. *Hamacher*, 339 Mass. 190, 194 (1959). Therefore, the taxpayer argues, the preponderance standard should have been used in the hearings before the board.

evidence, *as determined by the commissioner*, that the adjustments are unreasonable" (emphasis supplied). G. L. c. 63, § 31I(*c*)(i). See G. L. c. 63, § 31J(*a*)(1).

The disagreement hinges on the meaning of the phrase "as determined by the commissioner" in the Add Back Statutes. The taxpayer argues that the phrase creates an inference that the clear and convincing standard is confined to decisions made by the commissioner and does not extend to appeals of those decisions to the board. The commissioner, on the other hand, interprets the phrase as an instruction to the commissioner to provide guidance on the meaning of "clear and convincing evidence."[11] In the commissioner's interpretation, the taxpayer must show by clear and convincing evidence that the adjustments are unreasonable, whether the parties are before the commissioner or before the board.

Faced with these competing interpretations, the board concluded that the statute is "capable of being understood by reasonably well-informed persons in two or more different senses" and that it is therefore superficially ambiguous. See *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. 748, 753 (1996), quoting from 2A Singer, Sutherland Statutory Interpretation § 45.02, at 6 (5th ed. 1992).

Ultimately, the board concluded that the commissioner's interpretation was correct. In construing the statute, the board employed long-held principles of statutory construction that an ambiguous statute must be interpreted to (1) avoid absurd or unreasonable results and (2) give effect to the Legislature's intent. See *Manning* v. *Boston Redev. Authy.*, 400 Mass. 444, 452-453 (1987); *EMC Corp.* v. *Commissioner of Rev.*, 433 Mass. 568, 570, 574 (2001).

The board noted the absurd results that would occur if the taxpayer's interpretation was adopted: a decision of the com-

---

[11]The commissioner has promulgated regulations that provide guidance regarding the meaning of "clear and convincing evidence." Under 830 Code Mass. Regs. § 63.31.1(2) (2006), clear and convincing evidence is defined as "evidence that is so clear, direct and weighty that it will permit the Commissioner to come to a clear conviction without hesitancy of the validity of the taxpayer's claim. This evidentiary standard requires a strong showing of proof that instills a degree of belief greater than is required under the preponderance of evidence standard."

missioner to disallow a deduction, based on a taxpayer's failure to meet the clear and convincing standard, could be overturned by the board on *identical evidence* should the taxpayer succeed in meeting the lower preponderance standard. The board noted that this "would effectively nullify" the prior ruling of the commissioner made under the clear and convincing standard.

The board also properly considered the history of the Add Back Statutes to determine the intent of the Legislature. See *EMC Corp.* v. *Commissioner of Rev.*, 433 Mass. at 570. See also *Smith* v. *Commissioner of Transitional Assistance*, 431 Mass. 638, 646, 349 (2000); *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 633 (2005). When it enacted the Add Back Statutes several months after the decision in *Sherwin-Williams*, the Legislature, the board pointed out, quoting from St. 2003, c. 4, § 84,[12] explicitly "clarif[ied] its original intention that the taxpayer is required to possess for a transaction . . . both: (1) a valid, good-faith business purpose, other than tax avoidance; and (2) economic substance apart from the asserted tax benefit in order to claim a deduction . . . ." The board concluded that "[a]gainst this backdrop," the "[i]nclusion of the heightened standard of proof evinces an unmistakable intent to subject the transactions to closer scrutiny [than before the enactment of the Add Back Statutes] and provides a mechanism to effectuate this purpose."

Massachusetts law requires some deference to the board in resolving an ambiguous statute. See *Zoning Bd. of Appeals of Amesbury* v. *Housing Appeals Comm.*, 457 Mass. 748, 759 (2010). We must not "substitute our judgment for that of an administrative agency if its interpretation of a statute is reasonable." *Alves's Case*, 451 Mass. 171, 177 (2008).

We conclude that the board's decision was "based on substantial evidence and on a correct application of the law," *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993). Therefore,

___

[12]Statute 2003, c. 4, § 84, states, "By the enactment of [St. 2003, c. 4, § 17, inserting G. L. c. 63, §§ 31I & 31H,] . . . the general court clarifies its original intention that the taxpayer is required to possess for a transaction both: (1) a valid, good-faith business purpose, other than tax avoidance; and (2) economic substance apart from the asserted tax benefit in order to claim a deduction, exemption or other tax benefit."

we decline to overturn its conclusion regarding the burden of proof carried by the taxpayer.

3. *The interest expenses of 2001, 2002, and 2003.* For a putative interest payment to be validly deducted from net income, the payment must be made on true debt. See *Overnite Transp. Co.* v. *Commissioner of Rev.*, 54 Mass. App. Ct. 180, 186 (2002) (*Overnite Transp. Co.*). When "the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull." *Ibid.*, quoting from *Fin Hay Realty Co.* v. *United States*, 398 F.2d 694, 697 (3d Cir. 1968).

The taxpayer asserts that it intended to create true debt, and to support this contention it points to Kimberly-Clark's "execut[ion] [of] loan agreements and notes with each of the subsidiaries." However, the loan instruments created by the parties, and the records of those instruments, "do not necessarily constitute a reliable reflection of the true nature of the transaction." *New York Times Sales, Inc.* v. *Commissioner of Rev.*, 40 Mass. App. Ct. 749, 753 (1996).

In the past we have looked to the provisions within loan agreements, among other considerations, to determine whether the debt is true. For example, "the absence of provision for security in a loan of this scale [$600 million] is telltale that a 'loan' is not real, . . . and so, also, for the absence of meaningful enforcement mechanisms." *Overnite Transp. Co.*, 54 Mass. App. Ct. at 189-190. Here, the board found that "the [l]oan [a]greement and associated promissory notes made no provision for security, and contained no default or collateral provisions." The board further found that there was no evidence that the debts in question had ever been repaid. The board considered this significant given the fact that the hearings before the board, held in October and November of 2009, occurred well *after* the promissory notes came due in December, 2003, and December, 2008.

An additional factor to be considered when determining the validity of a loan is whether arm's-length interest rates were charged on the transactions in question. See *General Mills, Inc.* v. *Commissioner of Rev.*, 440 Mass. 154, 165 (2003), cert.

denied, 541 U.S. 973 (2004). Cf. *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 513-514 (irrelevant that payments might have been equivalent to those in an arm's-length transaction because such payments were unnecessary and part of a contrived mechanism). The taxpayer argues that the loans at issue are expressly tied to the applicable Federal rate outlined in § 1274(d) of the Internal Revenue Code, 26 U.S.C. § 1274 (2006), and are therefore necessarily arm's length. Kimberly-Clark's vice-president and assistant comptroller testified that the company charged "the rate that would be published by the IRS as what is representative of an arm's-length transactional rate as opposed to going into individual negotiations . . . ." The board noted that the same rate was applied to each loan, despite a lack of testimony that the various subsidiaries were equally creditworthy.

Ultimately, the board found that the technically compliant yet indiscriminately applied rate was not enough to prove the loans created true debt, when considered together with the absence of security provisions in the agreements and notes and the apparent failure by the taxpayer to repay the loans when they came due. The board therefore concluded that the commissioner properly added back the interest expense deductions related to the cash-management system. This decision was "based on substantial evidence and on a correct application of the law," and we decline to overturn it. See *Koch* v. *Commissioner of Rev.*, 416 Mass. at 555.

The board also concluded, and the taxpayer does not contest, that the "nature of the transactions within the cash-management system did not change" from 2001 through 2003. Since the only relevant change between 2001 and the latter two tax years is the application of the higher "clear and convincing" standard of proof, as required by G. L. c. 63, §§ 31I(c)(i) and 31J(a)(1), the board concluded that the commissioner's disallowance of the interest expenses for the latter two years must also be upheld. Substantial evidence supports this conclusion, and we therefore decline to overrule the board's decision regarding the interest expense deductions for the latter two years.

4. *The 2002 royalty payments.* On appeal, the taxpayer frames its argument concerning the 2002 royalty payments largely within the Massachusetts sham-transaction doctrine. Under that

common-law doctrine, the commissioner may "disregard, for taxing purposes, transactions that have no economic substance or business purpose other than tax avoidance." *Sherwin-Williams*, 438 Mass. at 79, quoting from *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 509-510. The taxpayer argues that the facts and circumstances of this case "meet or exceed the threshold for economic substance articulated by *Sherwin-Williams*." To support this contention the taxpayer cites to the facts that (1) legal and physical title to the patents and management of the trademarks passed from Kimberly-Clark and Scott to its subsidiary, as in *Sherwin-Williams*, 438 Mass. at 86; (2) Kimberly-Clark subsidiary Worldwide had approximately 1,200 employees in the time period in question, while the Sherwin-Williams subsidiary had only two, see *id.* at 77; and (3) Worldwide had a far more substantial independent physical and operational infrastructure than did the Sherwin-Williams subsidiary.

The taxpayer, however, does not mention the substantial ways in which this case *differs* from *Sherwin-Williams*. Central to the Supreme Judicial Court's holding that the transactions in *Sherwin-Williams* had economic substance and business purpose was the fact that the royalties transferred to the subsidiaries were *not* immediately returned to Sherwin-Williams but, rather, were "invested (and therefore placed at risk) by the subsidiaries, under their own investment guidelines and with third parties outside of Sherwin-Williams's control." *Id.* at 87-88. In contrast, in the present case the royalty payments were returned to Kimberly-Clark on a daily basis by way of the cash-management system, and not subject to investment by the subsidiaries.[13]

Also, a significant consideration in the court's ruling in favor of the taxpayer in *Sherwin-Williams* was the fact that the subsidiaries to whom the trademarks had been transferred

---

[13]The taxpayer asserts that the cash-management system did not constitute a "circular flow" of funds, as it was characterized by the board. The taxpayer asserts, without a cite to the record, that the royalty payments became "part of the pooled funds available to all subsidiaries participating in the cash management system," and that both the subsidiaries and the parent company could borrow from the pool when needed. However, the board found that "[h]aving issued disbursements to the subsidiaries only to satisfy their operating needs, excess balances remained with Kimberly-Clark indefinitely," and that Kimberly-Clark was in a net borrowing position at the end of each of the tax years at issue.

"entered into genuine obligations with unrelated third parties for use of the marks." *Id.* at 86. In contrast, the board here found that "the record does not reflect that Worldwide negotiated or entered into third party licensing agreements with respect to the intellectual property it owned or managed," and that the "licensing agreements among Kimberly-Clark, Worldwide and various affiliated entities were de facto exclusive licenses."

These latter two distinguishing factors weigh heavily against the taxpayer's argument that the 2002 royalty payments had the requisite level of economic substance and business purpose. Moreover, they are more significant factors than Worldwide's considerable size and independent infrastructure. Although Worldwide's existence as a business entity separate from Kimberly-Clark may have been justified by reasons other than tax avoidance, that does not necessarily affect a conclusion that the *transactions* between the related entities were effected principally for the purpose of tax avoidance. Cf. *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 510 n.8 ("A corporation created, *or a transaction* engaged in for the purpose of reducing taxes may not be disregarded so long as it has some economic substance or valid business purpose" [emphasis supplied]).

As the board correctly noted, the test developed in *Sherwin-Williams* and the other sham-transaction cases has been "modified and strengthened by the Add Back statutes." It is undisputed that the 2002 royalties paid by Kimberly-Clark to Worldwide qualify as "intangible expenses . . . paid . . . to . . . one or more related members" and are thus covered by the Add Back Statutes. G. L. c. 63, § 31I(*b*). The royalty payments therefore must be added back to the taxpayer's net income unless the taxpayer can establish "by clear and convincing evidence, as determined by the commissioner, that the adjustments are unreasonable." G. L. c. 63, § 31I(*c*)(i). The commissioner has stated that an add back presumptively required under the statute is considered unreasonable only where the taxpayer "demonstrates that reduction of tax was not a principal purpose for the transaction." 830 Code Mass. Regs. § 63.31.1(4)(a)1.b. The board in considering this appeal "analyzed the facts and issues . . . in the context of the explicit provisions of § 31(I), with consideration to relevant public written statements issued by the

[c]ommissioner." It concluded that, "since passage of § 31I, to avoid add back of the royalty expenses at issue here, a taxpayer must demonstrate, by clear and convincing evidence, the presence of both economic substance and valid business purpose as well as that tax reduction was not a principal purpose of the transaction."

In light of this statutory mandate, the taxpayer offers scant evidence from the record to show that reduction of tax was not a principal purpose of the royalty payment system. As the board noted, the only witnesses who testified at the hearings regarding the purposes of the 1996 reorganization were Kimberly-Clark's director of tax defense, assistant controller for tax accounting, and controller. The board also noted that, in an internal document explaining the 1996 reorganization, Kimberly-Clark stated that a purpose of the reorganization was to "produce . . . significant tax savings." Based on the record before this court, the evidence substantially supported the board's findings that the taxpayer failed to prove its "assertions that the reorganization giving rise to the disputed royalties was supported by economic substance, was motivated primarily by a valid business purpose, and lacked tax reduction as one of its principal purposes," and supported the board's conclusion that the taxpayer failed to prove by clear and convincing evidence that the add back of the 2002 royalty payments was unreasonable within the meaning of G. L. c. 63, § 31I.[14] We therefore decline to overturn the board's decision with respect to the 2002 royalty payments.

5. *The 2003 rebate payments.* Finally, we conclude that substantial evidence supported the board's finding that the rebate payments of 2003 were in fact embedded royalties and thus subject to the Add Back Statutes. In the relevant agreements, the rebates are described as based on the "cost savings" realized by certified suppliers, such as Worldwide, for their "use of certain patents and process intangibles." Although the substantial royalty payments of the previous year were massively scaled back in 2003, the taxpayer instead deducted the rebate expenses

---

[14]It is worth noting that although the taxpayer disputes the use of the clear and convincing standard before the board, it does not articulate any reason why the result of the hearings would have been different had a lower standard been used.

that were made to their subsidiaries. No evidence was presented by the taxpayer to suggest that the rebate payments were in place before 2003, and the record supports a finding that the rebate payments were "expenses . . . for, related to, or in connection directly or indirectly with the . . . use . . . of intangible property" (in this case the patents and trademarks). G. L. c. 63, § 31I(*a*) (defining "intangible expenses and costs").

*Conclusion.* Here, the record ultimately provided little support for an argument that the transactions in question had a legitimate business purpose or "economic substance apart from the asserted tax benefit." St. 2003, c. 4, § 17. Rather, the record and the board's findings supported the conclusion that tax avoidance was "a principal purpose" of the transactions, and the taxpayer did not carry its burden of proving by clear and convincing evidence that the required add backs were unreasonable within the meaning of G. L. c. 63, § 31I.[15] The decision of the Appellate Tax Board is affirmed.

*So ordered.*

---

[15]We note in closing that this case does not represent a situation where a taxpayer had manifold legitimate business reasons for transacting with a related entity, yet yielded a tax benefit from those transactions. Cf. *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 510 n.8 ("A tax avoidance motive is, of course, not necessarily fatal. A corporation created, or a transaction engaged in for the purpose of reducing taxes may not be disregarded so long as it has some economic substance or valid business purpose").